[Crim. No. 11617. Third Dist. July 26, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
TIMOTHY PITCOCK, Defendant and Appellant.

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Louis N. Hiken, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Joel E. Carey and Raymond L. Brosterhous II, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**REGAN, Acting P. J.**—Defendant was convicted by jury of an attempted escape from Deuel Vocational Institution, in violation of Penal Code section 2042. He was sentenced to the middle term of two years to be served consecutively to the prison term he was serving when he attempted to escape. The two-year sentence was based on the punishment prescribed by Penal Code section 18 for a violation of Penal Code section 2042. The consecutive application of the term was based on (1) the well-planned and sophisticated plan of escape as opposed to a spontaneous act, and (2) defendant's very poor prior record of felony convictions.

On appeal, defendant contends the trial court erred prejudicially in (a) instructions; (b) requiring him to wear shackles in court; and (c) sentencing.

## FACTS

On November 23, 1980, defendant was a prisoner at Deuel Vocational Institution (DVI). He was incarcerated in East Hall cell 230. At the regular 10 p.m. security check, Correctional Officer Maldonado, discovered a "dummy" made of rags, hair and a cap under the sheet of defendant's bed. He also noted the bars on the cell window were cut nearly through and the cuts concealed with a putty-like substance.

Maldonado entered the adjacent cell knowing the occupant, Craig Neil, was defendant's friend. After Neil stepped out, Maldonado found the bars in his cell were completely cut through and that the cuts were also camouflaged with a putty-type substance. Defendant was found in the cell, hiding under Neil's bed. Three sheets tied together, measuring about eighteen feet in length, were found in Neil's cell.

Defendant's defense was "necessity." He admitted cutting his cell bars with a hacksaw blade, concealing the cuts with toothpaste, and preparing the dummy found in his bed. He further admitted hiding under Neil's bed with knowledge that Neil's bars were sawed through. He said he expected to be apprehended during the escape, and to receive a transfer to San Quentin. He claimed he wanted a transfer because of threats of the Nuestra Familia prison gang. He said he had been the victim of previous attacks and that his prior administrative attempts to receive a transfer had been denied.

On cross-examination regarding his intent, defendant admitted that if he had not been caught, he would have climbed out Neil's window and accompanied Neil in the escape. Once outside the prison walls, he admitted he would have "gone on my own" and would not have returned to the institution.

## DISCUSSION

### I

■ Defendant contends the trial court erred while giving the "necessity" defense instruction when it included a statement that a required element of that defense was "the prisoner has a specific intent to report to the proper authorities if he attains a position of safety from the immediate threat."

The above-quoted instruction was given as a modification of the last of the five elements of the "necessity" defense enunciated in the case of *People* v. *Lovercamp* (1974) 43 Cal.App.3d 823, 831-832 [118 Cal. Rptr. 110, 69 A.L.R.3d 668]. That case dealt with a fact situation in which the defendant who raised the defense had completed her escape and testified she *had* to get away from the prison to avoid lesbian attacks, fights and possible death. The fifth and last of the series of requirements to establish the defense as defined in *Lovercamp* was as follows: "The prisoner immediately reports to the proper authorities when he has attained a position of safety from the immediate threat." (*Id.*, at p. 832.)

It is defendant's position that the instruction as modified to fit this case (an *attempted* escape) placed a "higher burden of proof on an individual charged with attempted escape than it does on a defendant who actually escapes." This was prejudicial, according to defendant, in that defendant was required to carry the burden of proof on an element of his defense that would not have been imposed, even in the event that he had escaped.[1] We reject defendant's contention of prejudicial error.

While it is true that *Lovercamp* involved a charge of escape, while this case addresses an attempt, analysis of the facts reveals not a distinction, but an analogy. In *Lovercamp* (43 Cal.App.3d at p. 825), both escaping defendants were "promptly" apprehended "a few yards away." In promulgating a requirement that *ordinarily* an escapee promptly turn himself in upon reaching safety, the *Lovercamp* court recognized that such a rule would not realistically apply to the *Lovercamp* facts since in that case, *as in this case*, the escapee was apprehended *before there was any opportunity to report to the authorities*. Accordingly, the *Lovercamp* court ordered the following instructions for retrial of *that* cause: "(5) Because the defendants were apprehended so promptly and in such close proximity to the institution, we do not know *whether they intended to immediately report to the proper authorities at the first available opportunity*. Obviously, even though the defendant may have the mentality of a 12-year-old [of which there was evidence], on retrial it must be anticipated that she will so testify. Whether that testimony is believable under the facts and circumstances of this case, will be a question of fact addressed to the jury."[2] (Italics added. *Id.*, at p. 832.)

---

[1]Defendant points out that the *Lovercamp* instruction required only that the escaped prisoner immediately report to authorities after he escaped, *not* that he had the specific intent to report to authorities when he escaped.

[2]Here, retrial on this point is not required since testimony *was* given; and defendant's testimony constituted substantial evidence upon which the jury impliedly found he did not intend to turn himself in.

Although defendant insists the *Lovercamp* defense focuses on "conduct" rather than "intention," the quoted language dispels such a conclusion.

While the *Lovercamp* decision is itself sufficient authority for the trial court's instructions here, we feel it appropriate to note also that the simple fact that it may be more difficult in a given situation to establish a defense to a charge of attempt to do an act than to establish a defense to a charge of doing the act itself (i.e., higher "burden of proof" of a defense) does not ipso facto violate any known right of a defendant or render otherwise proper instructions in such cases erroneous. The crimes are separate and distinct. (See, e.g., *People* v. *Franquelin* (1952) 109 Cal.App.2d 777, 783, 784-786 [241 P.2d 651]; *People* v. *Gallegos* (1974) 39 Cal.App.3d 512, 515-516 [114 Cal.Rptr. 166].)

## II

■ Defendant contends the trial court erred prejudicially in requiring him to wear shackles at trial. The contention is without merit in light of the crime involved and defendant's past record which the trial court had before it.

The trial court ruled that defendant was to remain shackled during the trial but pointed out to the jury that this was the routine practice when inmates were away from DVI, and that it had no bearing on the issue of his innocence or guilt on the attempted escape charge and no inference could be drawn from it. Defendant was, however, granted permission to wear civilian clothes rather than prison garb.

Before making its ruling on defendant's motion to have his shackles removed, the trial court took evidence on the issue. The following facts emerged: (1) defendant had a history of attempts to escape from correctional institutions, including not only the escape attempt for which he was on trial, but also an attempt in January 1980 and another attempt only two weeks before the trial; (2) in this most recent incident defendant had been searched and found to be in possession of hacksaw blades; (3) defendant, who is a life termer, has a propensity to violence in custody, having been disciplined for possession of weapons and for setting fires on the cell block; (4) defendant's prior record includes first degree murder, kidnaping, and robbery; (5) DVI classification authorities considered defendant to be a disciplinary problem and a "serious escape risk"; and (6) during defendant's transportation to the court-

house for trial, he indicated to a guard that he was pessimistic about going to court and "was going to be talking us into letting him escape."

After hearing this evidence, the trial court found the "problems" of shackles were "offset by the security reasons . . . ." We agree.

The hearing referred to above furnished ample cause to comply with the rule of law on the subject of shackles in court, which is that a defendant cannot be shackled in the jury's presence unless there is a showing of manifest need. (*People* v. *Duran* (1976) 16 Cal.3d 282, 290-292 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1].) One of the most cogent showings of manifest need for such restraints is a record of violence and previous recent escapes or attempts to escape. (See *People* v. *Condley* (1977) 69 Cal.App.3d 999, 1006 [138 Cal.Rptr. 515].)[3]

Our appellate review is guided by principles enumerated in *People* v. *Duran, supra,* 16 Cal.3d 282. It was there stated (at p. 291) that "the trial court is vested, upon a proper showing, with discretion to order the physical restraint most suitable for a particular defendant in view of the attendant circumstances." We are faced, therefore, with a question of abuse of discretion. We find none here, since abuse of discretion implies arbitrary determination, capricious disposition or whimsical thinking where the court exceeds all bounds of reason, all of the circumstances being considered. (*People* v. *Giminez* (1975) 14 Cal.3d 68, 72 [120 Cal.Rptr. 577, 534 P.2d 65]; *People* v. *Bradford* (1976) 17 Cal.3d 8, 20 [130 Cal.Rptr. 129, 549 P.2d 1225]; *People* v. *Rist* (1976) 16 Cal.3d. 211, 219 [127 Cal.Rptr. 457, 545 P.2d 833].)

In light of this record, we find no abuse of discretion.

### III

Defendant contends the trial court erred in sentencing him to two years consecutive time for his attempted escape from DVI. He argues he should have received a sentence of but eight months consecutive time under the applicable statutes.

---

[3]We have examined defendant's cited cases. His attempts to distinguish *Condley, supra,* are ineffective. His reliance on such cases as *People* v. *Burwell* (1955) 44 Cal.2d 16 [279 P.2d 744], *People* v. *Jacla* (1978) 77 Cal.App.3d 878 [144 Cal.Rptr. 23], and *People* v. *Stabler* (1962) 202 Cal.App.2d 862 [21 Cal.Rptr. 120], as well as others, is misplaced due to either factual or legal distinctions, or both, which are readily apparent.

The basis of defendant's contention is that his attempted escape from DVI was not from a "state prison" as that term is used in Penal Code section 1170.1, subdivision (b), but rather from a state "institution." It follows, in defendant's view, that the lesser subordinate term provided for in Penal Code section 1170.1, subdivision (a), for crimes outside a prison, should have been applied. (Cf. *People* v. *Galliher* (1981) 120 Cal.App.3d 149, 153 [174 Cal.Rptr. 467]; *In re Sims* (1981) 117 Cal. App.3d 309, 313-314 [172 Cal.Rptr. 608]; *In re Kindred* (1981) 117 Cal.App.3d 165, 167-168 [172 Cal.Rptr. 468].)

Subdivisions (a) and (b) of Penal Code section 1170.1 deal with various situations in which a trial court imposes a consecutive sentence upon a felon convicted of two or more felonies. Subdivision (a), in the portion here pertinent, provides that where a court imposes a subordinate sentence for a felony, to be served consecutively with a principal sentence already being served, the subordinate term (here for the attempted escape) "shall consist of one-third of the middle term" prescribed for the subordinate crime. On the other hand, subdivision (b) deals with the special situation in which the subordinate felony is one committed while the defendant "is confined in a state prison, . . ." In such a situation, the law deals more harshly with the felon and allows the trial court to impose "consecutive terms" without any limitation as to which of the terms it applies (lower, middle or upper).

Defendant here was sentenced under the provisions of subdivision (b). The two-year term was derived from a combination of Penal Code sections 18 and 2042. Section 2042 provides that "[e]very person confined in the California Vocational Institution who escapes or attempts to escape therefrom is guilty of a crime and shall be imprisoned in a state prison, or in the county jail for not exceeding one year." Section 18 furnishes the punishment range for all offenses which are punishable as felonies (and no different punishment is provided) as sixteen months, two years or three years. Here, the court, after the usual presentencing procedures, selected the middle term of two years.

The dispute over whether this full two years should be added to defendant's principal term which he is serving or only one-third of it (eight months) has its genesis in a long-running ambiguity over the exact status of DVI. Is it a state prison? Is it some form of a state correctional facility other than a state prison? Is it both? Is it sometimes one thing and sometimes another?

In 1967, this court addressed itself to these questions in the case of *People* v. *Romo* (1967) 256 Cal.App.2d 589 [64 Cal.Rptr. 151]. We held that for purposes of Penal Code sections 4501 and 4502 (assault with a deadly weapon and possession of it by a person "confined in a state prison") DVI is a state prison with respect to those inmates in the custody of the Department of Corrections and "an institution or facility outside the state prison category in relation to those inmates who are wards of the Youth Authority." (Pp. 594-595) Therefore, we ruled, a person incarcerated in DVI who was a ward of the Youth Authority was not "confined in a state prison."

*Romo* was followed by *People* v. *Hasson* (1968) 265 Cal.App.2d 865 [71 Cal.Rptr. 664], in which a prisoner under the jurisdiction of the Youth Authority assaulted a DVI guard. The defendant was held not to have been "confined in a prison" for the purpose of the statute making it a special offense to assault a prison guard.[4]

Later in 1968 the unique character of DVI was emphasized by the case of *People* v. *Petterson* (1968) 268 Cal.App.2d 263 [73 Cal.Rptr. 693], in which the Fourth District Court of Appeal held the statute making it a felony to injure or destroy a jail "or prison" (Pen. Code, § 4600) applicable to the California Rehabilitation Center at Norco. The court pointed out that the statutory pattern creating Norco was different from that creating DVI (and exhaustively analyzed in *Romo*) and in the case of Norco it was specifically referred to in a statute as "a prison." (*Id.*, at p. 267.)

In 1969, the Supreme Court, making reference to *Romo*, decided in *In re Branch* (1969) 70 Cal.2d 200 [74 Cal.Rptr. 238, 449 P.2d 174], that while statutes which proscribe acts in a "state prison" do not apply to Youth Authority wards confined at DVI, the statutes are different as to a person confined at Soledad Correctional Training Facility though he was in a portion of that institution designated "'. . . to serve the same purpose and to have the same security standards as [DVI].'" (Pen. Code, § 2045.1; *id.*, at pp. 216-217.) The key to this decision is again a different statutory pattern in which Soledad is defined by statute as a "state prison." (Pen. Code, § 2045.1; *id.*, at p. 217.)

---

[4]The court (Fifth District) was not enthusiastic about the *Romo* decision but pointed out that "[w]ere it not for the fact that the Supreme Court denied a hearing of the case . . . we would feel free to consider the matter on its merits and, if we believed that Mr. Justice Pierce's dissent was sound, we would not hesitate to decide accordingly." (*Hasson*, 265 Cal.App.2d at p. 866.) The Supreme Court denied a hearing in the *Hasson* case.

Also in 1969 the court of appeal (First District) referred to the distinction between DVI and "state prisons" when it distinguished *Romo* from the situation before it and held that a person confined in San Quentin (a state prison) under a civil commitment as a "sexual psychopath" (now mentally disordered sex offender) was subject to prosecution under Penal Code section 4502 for possessing a sharp instrument while "confined in a state prison." (*People* v. *Lopez* (1969)' 1 Cal.App. 3d 672, 681-682 [82 Cal.Rptr. 121].)

*Romo* remains the law insofar as DVI is concerned. However (unlike the defendant in *Romo*), here the defendant had not been sent to DVI as a ward of the Youth Authority. We take judicial notice of his sentence to state prison in 1975 for first degree murder, kidnaping, burglary and robbery and the court order that he be delivered into the custody of the Director of Corrections. Accordingly, pursuant to *Romo*, defendant is to be treated as a prisoner confined in a state prison, insofar as statutes are concerned which proscribe acts performed while so confined.

Defendant argues that there is an indication of legislative intent not to include DVI as a "state prison" within the meaning of Penal Code section 1170.1, subdivision (b), since the Legislature enacted a separate statute proscribing DVI escapes, as contrasted to the general prison escape statute (Pen. Code, § 4530). According to defendant, this is clear evidence that such escapes are to be treated differently for all purposes. We agree that by providing the more flexible sentencing option of an alternative felony-misdemeanor ("wobbler"), such escapes are treated by the Legislature differently from escapes from other Department of Corrections facilities, as to which escapes are punished as a straight felony. (Pen. Code, § 4530.) However, this differing treatment is more sensibly interpreted as legislative recognition that the potential class of escapees includes both Department of Corrections *and* Youth Authority inmates (as expounded in *Romo*). The provision of potentially more lenient sanctions is in harmony with the general legislative objective of emphasizing reformation and rehabilitation with respect to Youth Authority wards (e.g., Welf. & Inst. Code, §§ 1716-1721, 1737.1, 1766, 1772).[5]

Lacking some concrete or implicit indication of legislative will, the provision of such mitigated penalties in a separate statute cannot alone

---

[5]Such objectives are in contrast with the modern general legislative goal in terms of *adult* imprisonment for crime, which is punishment. (Pen. Code, § 1170, subd. (a)(1).)

Lacking some concrete or implicit indication of legislative will, the provision of such mitigated penalties in a separate statute cannot alone be reasonably said to have been intended to affect the ultimate determinate sentencing computation of consecutive sentences in section 1170.1. They are entirely different matters.

The DVI escape statute, section 2042, was enacted in 1947 under California's indeterminate sentencing scheme. Former section 1170.1a, section 1170.1's predecessor statute, providing enhanced penalty computations for prison crimes, was not enacted until the advent of California's determinate sentencing format in 1976.[6] It cannot reasonably be argued that the provision of the special statute (§ 2042) 30 years earlier was intended to affect the computational formula for consecutive sentencing just recently formulated by the Legislature. Moreover, it is a principal of statutory construction that where there are potentially conflicting legislative enactments, the later enactment controls. (*Adams* v. *Superior Court* (1970) 8 Cal.App.3d 569, 572 [87 Cal.Rptr. 667]; *People* v. *Kuhn* (1963) 216 Cal.App.2d 695, 700-701 [31 Cal.Rptr. 253].) It follows that DVI is a state prison for purposes of sentencing under section 1170.1, subdivision (b), with respect to an inmate who has been placed in custody of the Department of Corrections at sentencing, and the trial court properly subjected defendant to the sentencing computation of that section.

The judgment is affirmed.

Blease, J., and Sparks, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 30, 1982.

---

[6]Stats. 1976, ch. 1139, § 273.