[Crim. No. 12614. Third Dist. Jan. 25, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANK VALENZUELA, Defendant and Appellant.

**COUNSEL**

Barbara L. Roberts, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Roger E. Venturi and Anthony L. Dicce, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SIMS, J.**—Defendant, an inmate of Folsom prison housed in the maximum security unit on account of his conviction for murder, was found guilty by

a jury of possession of a prison-made knife. (Pen. Code, § 4502.) The knife, which was approximately four and three-fourths inches long, was lodged in defendant's lower colon. Its presence was revealed by an X-ray taken after defendant activated a walk-through metal detector during a "shakedown" search of the maximum security unit.

On appeal, defendant contends the judgment must be reversed because the prosecution failed to justify the warrantless search of his person with the metal detector and because the trial court ordered physical restraints for defense witnesses from the maximum security unit of Folsom prison when they testified. We shall affirm.

DISCUSSION

I

Defendant's motion to suppress the knife as evidence (Pen. Code, § 1538.5) was denied by the superior court, which noted that probable cause is not necessary for a prison security search.[1] Defendant's claim is that the prosecution failed to show the initial metal detector search was justified under the circumstances and that the court failed to balance the need for the procedure against the invasion of defendant's personal rights. We find no error.

A

We first address defendant's contention that the metal detector search violated defendant's rights under the Fourth Amendment to the United States Constitution.

In *Bell* v. *Wolfish* (1979) 441 U.S. 520 [60 L.Ed.2d 447, 99 S.Ct. 1861], the Supreme Court considered challenges by unsentenced, pretrial detainees to various practices undertaken by custodial officials at a federally operated, short-term custodial facility. Among the challenged practices were unannounced searches of inmate living areas at irregular intervals and body cavity searches conducted after inmates visited with persons from outside the institution. (*Id.,* at pp. 555-558 [60 L.Ed.2d at pp. 479-480].)

The *Bell* court assumed without deciding that both pretrial detainees and convicted prisoners retained a diminished expectation of privacy sufficient to invoke Fourth Amendment protection. (*Ibid.*) The court then pro-

---

[1]Defendant impliedly concedes the activation of the metal detector provided sufficient cause to X-ray him. He challenges only the initial search.

mulgated a rule requiring in each case a balancing of the need for the particular search against the invasion of personal rights that the search entails: "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. [Citations.]" (*Bell* v. *Wolfish, supra,* 441 U.S. at p. 559 [60 L.Ed.2d at p. 481]; see *In re Alan R.* (1982) 132 Cal.App.3d 601, 604 [183 Cal.Rptr. 325].) The court then upheld the legality of both the room search and the body cavity search. (*Bell* v. *Wolfish, supra,* at pp. 557-560; [60 L.Ed.2d at pp. 480-482].)

Like the court in *Bell,* we also assume arguendo that convicted prisoners retain some Fourth Amendment rights, and we therefore apply *Bell's* balancing test.

■ We examine first the scope of the particular intrusion and the manner in which it is conducted. The use of a walk-through metal detector is one of the least intrusive searches. (See *Bell* v. *Wolfish, supra,* 441 U.S. at p. 559, fn. 40 [60 L.Ed.2d at p. 482]; 3 LaFave, Search and Seizure (1978) Airport Searches, § 10.6 at pp. 348-350, and cases therein cited.) Countless thousands of citizens who have never been convicted of any crime routinely walk through metal detectors every day at our nations's airports. We conclude a walk-through metal detector search involves an insignificant invasion of personal rights.

■ We next examine the justification for initiating the search and the place where it was conducted. Defendant contends the prosecution failed to meet its burden of justifying the warrantless metal detector search (see *People* v. *Sedillo* (1982) 135 Cal.App.3d 616, 623 [185 Cal.Rptr. 475]) because the prosecution produced no evidence that the search was for weapons. We disagree.

The record indicates defendant was housed in security unit No. 1—the maximum security unit at Folsom state prison, itself a maximum security facility within the Department of Corrections. On the day of the search, correctional officers were conducting a "shakedown" search of the security housing unit. All inmates in the security housing unit were taken from their cells while the cells were searched, and defendant was taken to the walk-through metal detector. Following the searches, two other inmates from the maximum security unit were taken for medical examination of weapons or contraband concealed in their bodies. From these facts, the trial court could reasonably infer that the purpose of the "shakedown search" of the maximum security unit, and the administration of the metal detector test, were for the purpose of locating weapons or other contraband.

When we balance the invasion of defendant's personal rights against the justification for the search (*Bell* v. *Wolfish, supra,* 441 U.S. at p. 559 [60 L.Ed.2d at p. 481]), we readily conclude the metal detector search was justified. In *Bell,* the Supreme Court upheld as reasonable unannounced "shakedown" searches of the living quarters of unsentenced, pretrial detainees. (*Id.,* at pp. 555-557 of 441 U.S. [60 L.Ed.2d at pp. 479-480].) A fortiori, a less intrusive metal detector search for weapons or contraband in a maximum security unit for sentenced prisoners passes muster under the Fourth Amendment. ■ "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (*Bell* v. *Wolfish, supra,* 441 U.S. at p. 547 [60 L.Ed.2d at p. 474].) Such considerations are peculiarly within the province and professional expertise of corrections officials and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters. (*Id.,* at p. 548 of 441 U.S. [60 L.Ed 2d at p. 474].)

■ Finally, defendant contends the trial court applied an erroneous standard when it stated on the record that "people confined in a State Prison are subject to search without probable cause." We perceive no error.

We presume the trial judge was using "probable cause" in the sense in which it appears most frequently in search cases: a requirement that in order to conduct a search, and absent exigent circumstances, police officers must obtain a search warrant by demonstrating they have probable cause to believe there is specific property subject to seizure presently located in the particular place for which the warrant is sought. (*People* v. *Superior Court (Corona)* (1981) 30 Cal.3d 193, 203-204 [178 Cal.Rptr. 334, 636 P.2d 23]; see *People* v. *Carney* (1983) 34 Cal.3d 597, 603 [194 Cal.Rptr. 500, 668 P.2d 807]; *People* v. *Chavers* (1983) 33 Cal.3d 462, 467 [189 Cal.Rptr. 169, 658 P.2d 96].)

In *Bell* v. *Wolfish, supra,* 441 U.S. 520, the Supreme Court made it clear no warrant is required to conduct an unannounced "shakedown" search of the rooms of pretrial detainees. (*Id.,* 441 U.S. at p. 557 [60 L.Ed.2d at p. 480].) We recently held that, "In respect to those who are lawfully detained, governmental authorities can conduct routine administrative searches without any 'cause' at all as long as reasonable and justified by legitimate state interests." (*In re Alan R., supra,* 132 Cal.App.3d at pp. 604-605.)

The trial court correctly concluded that correctional officers did not need "probable cause" to believe defendant had weapons or contraband secreted

on his person in order to subject him to the metal detector search under the Fourth Amendment.

B

■ Defendant next contends the metal detector search violated his rights under article I, section 13 of the California Constitution, which provides in part that "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches shall not be violated . . . ."

■ ■ ■ ■ ■ Defendant notes that our Supreme Court has, on occasion, elected to construe the foregoing provision so as to afford suspects a broader security against unreasonable searches and seizures than that required by the United States Supreme Court.[2] (See *People* v. *Chavers, supra,* 33 Cal.3d at p. 467; *People* v. *Brisendine* (1975) 13 Cal.3d 528, 549 [119 Cal.Rptr. 315, 531 P.2d 1099].) Here, defendant contends that in *DeLancie* v. *Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142], the Supreme Court construed Penal Code section 2600[3] so as to guarantee state prisoners some expectation of privacy. *DeLancie* held that, by virtue of Penal Code sections 2600 and 2601, the conversations between pretrial detainees and their visitors in a county jail cannot be monitored by jail officials absent a showing the monitoring is necessary to provide for the reasonable security of the institution. (*DeLancie, supra,* at p. 870.) Defendant argues the metal detector search unreasonably violated a right of privacy granted by *DeLancie's* interpretation of Penal Code section 2600, so that the unreasonable violation of defendant's privacy constituted a violation of the state constitutional prohibition against unreasonable searches and seizures. (Compare *People* v. *Crowson* (1983) 33 Cal.3d 623, 629 [190 Cal.Rptr. 165, 660 P.2d 389], plurality opn. of Kaus, Mosk, and Richardson, JJ.; *People* v. *Seaton* (1983) 146 Cal.App.3d 67, 80-81 [194 Cal.Rptr. 33].)

■ We do not address the question of the impact, if any, of *DeLancie* on this case. In *Donaldson* v. *Superior Court* (1983) 35 Cal.3d 24 [196 Cal.Rptr. 704, 672 P.2d 110], mod. December 31, 1983, the Supreme Court held that, for purposes of determining the legality of a search, *De-*

---

[2]Because the crime in this case was committed before June 9, 1982, the provisions of "the Victim's Bill of Rights" (Cal. Const., art. I, § 28) are inapplicable to this case. (*People* v. *Smith* (1983) 34 Cal.3d 251, 257-258 [193 Cal.Rptr. 692, 667 P.2d 149].)

[3]Penal Code section 2600 provides: "A person sentenced to imprisonment in a state prison may, during any such period of confinement, be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public."

*Lancie* does not govern police conduct that took place before the decision was filed. (*Donaldson, supra,* at p. 27.)

Relying primarily on *United States* v. *Johnson* (1982) 457 U.S. 537 [73 L.Ed.2d 202, 102 S.Ct. 2579], the court in *Donaldson* concluded that *DeLancie* "appears to represent the type of break from prior law which may justify nonretroactivity under *United States* v. *Johnson.*" (*Donaldson* v. *Superior Court, supra,* 35 Cal.3d at p. 37, fn. omitted.) Of course, *De-Lancie* was novel in at least two respects: (a) it acknowledged a right of privacy (subject to reasonable restriction) in Penal Code sections 2600 and 2601, and (b) it held the rights granted by those statutes (which on their face apply to state prisoners) applicable to pretrial detainees in a county jail. (*DeLancie* v. *Superior Court, supra,* 31 Cal.3d at p. 868.) In the instant case, a part of *DeLancie's* novelty is missing: defendant is a state prisoner, so Penal Code section 2600 applies to him on its face. Nonetheless, we perceive the essence of *DeLancie's* newness in its recognition of some statutory right of privacy in a custodial setting. Thus, *Donaldson* recognizes that, "Prior cases had held that at least as to nonprivileged conversations there existed no right of privacy in a jail or police station, and if that doctrine prevailed, mere application of the language of sections 2600 and 2601 would offer no protection." (*Donaldson* v. *Superior Court, supra,* 35 Cal.3d at p. 37.)

There is no question but that, prior to *DeLancie,* "the general rule [was] that an inmate of a jail or prison has no reasonable expectation of privacy." (*North* v. *Superior Court* (1972) 8 Cal.3d 301, 311 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155]; see *In re Cummings* (1982) 30 Cal.3d 870, 873 [180 Cal.Rptr. 826, 640 P.2d 1101]; *Halpin* v. *Superior Court* (1972) 6 Cal.3d 885, 900 [101 Cal.Rptr. 375, 495 P.2d 1295]; *People* v. *Lopez* (1963) 60 Cal.2d 223, 248 [32 Cal.Rptr. 424, 384 P.2d 16]; *People* v. *Califano* (1970) 5 Cal.App.3d 476, 481 [85 Cal.Rptr. 292]; *People* v. *Hernandez* (1964) 229 Cal.App.2d 143, 149 [40 Cal.Rptr. 100]; *People* v. *Morgan* (1961) 197 Cal.App.2d 90, 93 [16 Cal.Rptr. 838].)

We conclude that *Donaldson* gave *DeLancie* prospective application primarily because of the latter's novel conclusion that prisoners have some statutory privacy rights, a conclusion that directly affected the circumstances in which peace officers could monitor the conversations of prisoners. Consequently, *DeLancie* is entitled to prospective application in this case, even though it involves an inmate in state prison, because the same new statutory privacy interest is being asserted.

The metal detector search in the instant case occurred on July 15, 1981. *DeLancie* was not decided until almost a year later, on July 8, 1982. (*De-*

lancie v. Superior Court, supra, 31 Cal.3d 865.) Delancie therefore does not govern the conduct of custodial officers involved in the metal detector search. (Donaldson v. Superior Court, supra, 35 Cal.3d at p. 27.)

▮ We next examine whether defendant may base his state constitutional claim on pre-DeLancie law. The same question was addressed in Donaldson, supra, 35 Cal.3d at pages 30-34. There, defendant moved to suppress recordings of a conversation between defendant and his brother that occurred in a "bugged" interview room at a police station, at a time when neither defendant nor his brother was under arrest.

The Donaldson court reviewed North v. Superior Ct., supra, 8 Cal.3d 301 and subsequent cases and concluded, "The fundamental premise underlying all these decisions upholding admissibility [of statements] was that routine monitoring of police station and jail conversations was necessary for institutional security, and consequently that society should not recognize any expection of privacy which would impede that activity." (Donaldson, supra, 35 Cal.3d at p. 33.) Although pointing out that the pre-DeLancie cases were premised on a "legal fiction" (that no one can reasonably expect privacy in a jail or police station unless the conversation is protected by an evidentiary privilege), Donaldson concluded that, under pre-DeLancie law, the Donaldson brothers had no reasonable expectation of privacy as a matter of law. (Id., at p. 34.) If pre-DeLancie law provided no reasonable expectation of privacy for the unarrested Donaldson brothers in an interview room of a police station, then, a fortiori, that body of law could provide no greater expectation of privacy for defendant, a convicted felon incarcerated in a maximum security prison.

▮ Since defendant had no reasonable expectation of privacy under California law at the time the metal detector search was conducted, the search did not violate any rights of defendant under article I, section 13 of the California Constitution.[4]

II

In his testimony at trial, defendant maintained he was never sent through the metal detector and was forcibly X-rayed. He denied having any metal object in his rectum that day other than one he claimed a doctor inserted. To support his version of events in the cell block and the X-ray room, defendant called four inmate witnesses from Folsom prison. The witnesses' previous convictions, shown in the trial record, included armed robbery for

---

[4]Defendant has made no contention that the search violated any rights of privacy under article I, section 1 of the California Constitution, and we do not address that constitutional provision. (But see People v. Crowson, supra, 33 Cal.3d at p. 629.)

one, two burglaries, a robbery, and a prison stabbing for another, first degree murder for a third, and assault with a firearm for the fourth. All four were housed in the maximum security unit of a maximum security unit of a maximum security institution as a result of "problems" they had created elsewhere in the prison. One was also found to have been secreting a weapon in his rectum on the day defendant was searched. All were placed together in a holding area before and after they testified.

At a hearing,[5] the trial court stated, "[E]ach of these men is—each of the witnesses that I've ordered is an obvious inmate at Folsom Prison, one or two, you stated, maybe three, are in the SHU [Security Housing Unit].

"Therefore, they're within the maximum security holding cells or cells within the maximum security prison in California. And from that, I can make an inference that these men have records that are violent in nature and they're in the SHU because they are violent or they've created all kinds of problems or disturbance."

The court then ordered "each and every one of those prisoner witnesses will be brought in and they'll be under some type of reasonable restraint, and by that, I mean some body restraint such as shackles or handcuffs, whatever, in the discretion of the officers in whose charge he is placed, and they will testify in that—under that physical restraint.

"We will, of course, so that everyone knows, administer the oath to them outside the presence of the jury. The jury will be told by me that they're under oath."

The inmate witnesses were brought into and taken out of court outside the presence of the jury. They wore handcuffs attached to chains concealed under their clothing and were sworn and seated when the jury returned. Their hands were in their laps. The jurors closest to the witness stand may have been able to see the prisoners' hands, but the record does not show any juror actually observed the restraints.

On appeal, defendant argues the trial court's order constituted an abuse of discretion in violation of the principles set forth in *People* v. *Duran* (1976) 16 Cal.3d 282 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1].

---

[5]Defendant objects that the hearing was inadequate. However, defense counsel was invited to comment on the court's intention to restrain the witnesses and to submit legal authorities to the court. The court stated its reasons for imposing restraints. No evidence was taken *in camera*. (Cf. *Gibson* v. *Superior Court* (1982) 135 Cal.App.3d 774 [185 Cal.Rptr. 741].) The hearing procedure and statement of reasons by the court were adequate. (See *People* v. *Zatko* (1978) 80 Cal.App.3d 534, 550-551 [145 Cal.Rptr. 643]; *People* v. *Condley* (1977) 69 Cal.App.3d 999, 1008 [138 Cal.Rptr. 515].)

In *Duran*, a defendant charged with assault with a deadly weapon by a life-term prisoner (Pen. Code, § 4500) and possession of a dirk or dagger when confined in prison (Pen. Code, § 4502) was shackled apparently only because he was an inmate. (*Duran, supra,* 16 Cal.3d at p. 293.) The court held the trial court must make the decision to use physical restraints on a case-by-case basis and found the error, combined with others in the case, prejudicial under the test of *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]. (*Duran, supra,* at p. 296.)

The *Duran* court said: "In the interest of minimizing the likelihood of courtroom violence or other disruption the trial court is vested, upon a proper showing, with discretion to order the physical restraint most suitable for a particular defendant in view of the attendant circumstances. The showing of nonconforming behavior in support of the court's determination to impose physical restraints must appear as a matter of record and, except where the defendant engages in threatening or violent conduct in the presence of the jurors, must otherwise be made out of the jury's presence. The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion." (*Duran, supra,* 16 Cal.3d at p. 291.)

*Duran* makes it clear that a defendant's prior record of violent conduct, in and of itself, is insufficient to justify in-court restraints: "We do not mean to imply that restraints are justified only on a record showing that the accused is a violent person. An accused may be restrained, for instance, on a showing that he plans an escape from the courtroom or that he plans to disrupt proceedings by nonviolent means. Evidence of any nonconforming conduct or planned nonconforming conduct which disrupts or would disrupt the judicial process if unrestrained may warrant the imposition of reasonable restraints if, in the sound discretion of the court, such restraints are necessary." (*People* v. *Duran, supra,* 16 Cal.3d at pp. 292-293, fn. 11.)

"[I]n determining whether physical restraints are to be employed, the record must show the likelihood of escape from violence [*sic*] or a threat of violence or other nonconforming conduct *in the courtroom.*" (*People* v. *Jacla* (1978) 77 Cal.App.3d 878, 883 [144 Cal.Rptr. 23], italics in original.) Thus, except where codefendants with lengthy records of joint escape attempts were on trial for another escape (see *People* v. *Condley, supra,* 69 Cal.App.3d at p. 1006; cf. *People* v. *Burnett* (1980) 111 Cal.App.3d 661, 667 [168 Cal.Rptr. 833]), the Courts of Appeal have generally read *Duran* as requiring that a defendant make specific threats of violence or escape from court or demonstrate unruly conduct in court before in-court restraints are justified. (See, e.g., *People* v. *Pitcock* (1982) 134 Cal.App.3d 795, 801

[184 Cal.Rptr. 772] [restraints justified where defendant made remarks indicating intent to escape from trial]; *Soloman* v. *Superior Court* (1981) 122 Cal.App.3d 532, 536 [177 Cal.Rptr. 1] [fact that defendants charged with armed robbery insufficient to justify restraints]; *People* v. *Burnett, supra,* 111 Cal.App.3d at p. 667 [seven-year-old prior escape conviction insufficient to justify restraints]; *People* v. *Zatko* (1978) 80 Cal.App.3d 534, 551 [145 Cal.Rptr. 643] [restraints justified where defendant made specific threat that violence would occur at courtroom]; *People* v. *Jacla, supra,* 77 Cal.App.3d at pp. 883-884 [fact that defendant was engaged in shooting spree while on bail 48 hours before court hearing found insufficient to justify restraints]; *People* v. *Prado* (1977) 67 Cal.App.3d 267, 275 [136 Cal.Rptr. 521] ["inadequate facilities" no justification for restraints].)

In the instant case, the record fails to show that any of defendant's witnesses had made any threats to escape or to disrupt the courtroom, nor is there any showing that they had ever acted in an improper manner in court. The record unmistakably shows the trial judge ordered restraints because of the witnesses' extensive history of violent conduct—conduct that had landed them in a maximum security unit of a maximum security prison.

Without intending any disrespect, we are compelled to conclude that, if we were writing on a new blackboard, we would find no abuse of discretion in the trial court's order. In our view, none of the policies that underlie *Duran's* restrictions on the shackling of a defendant applies to this case. Here, defendant was charged with having committed an offense in prison; it was therefore reasonably probable, at the time the court made its ruling, that the jury would learn from the witnesses' own testimony that they were felons thought to be dangerous and therefore incarcerated in a maximum security unit. We discuss the policies underlying *Duran's* rule in light of these facts.

*Duran* first mentions that, "When a defendant is charged with any crime, and particularly if he is accused of a violent crime, his appearance before the jury in shackles is likely to lead the jurors to infer that he is a violent person disposed to commit crimes of the type alleged. [Citations.]" (*People* v. *Duran, supra,* 16 Cal.3d at p. 290.) That policy is inapplicable where an independent witness, not charged with responsibility for the crime nor shown to be acting in concert with the defendant, is the one who is shackled.

*Duran* also mentions that "The removal of physical restraints is also desirable to assure that 'every defendant is . . . brought before the court with the appearance, dignity, and self-respect of a free and innocent man.' [Citations.]" (*Duran, supra,* at p. 290, quoting *Eaddy* v. *People* (1946) 115 Colo. 488, 492 [174 P.2d 717].) That policy is similarly inapplicable to

independent witnesses not entitled to the classic presumption of innocence, whose very testimony is likely to disclose to the jury that they are not free and innocent men but are, rather, men whose felonious acts have caused them to be incarcerated in a maximum security unit.

Another policy favoring the freedom of a defendant is that the use of restraints " 'is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.' [Citations.]" (*Duran, supra,* 16 Cal.3d at p. 290.) Whatever may be said about that policy with respect to an accused, we presume that trial judges, in ruling on the propriety of shackling inmate witnesses, have in mind their own desire and need to uphold the dignity and decorum of their proceedings. In that regard, they might reasonably consider the sudden lack of judicial decorum that can occur during a violent escape from the courtroom. Moreover, where, as in this case, restraints are unobtrusive (or arguably unseen), the restraints have a negligible effect on the "dignity or decorum" of judicial proceedings. (See *People* v. *Frausto* (1982) 135 Cal.App.3d 129 [185 Cal.Rptr. 314].) In any event, we trust that jurors who are already asked to determine whether a defendant incarcerated in state prison stashed a knife in his rectum would not be unduly offended by the glimpse (if even that is what they got here) of handcuffs.

Finally, we turn to an important consideration: that of the credibility of the shackled witness. Citing *Kennedy* v. *Cardwell* (6th Cir. 1973) 487 F.2d 101, (cert. den. *sub. nom. Kennedy* v. *Gray* (1974) 416 U.S. 959 [40 L.Ed.2d 310, 94 S.Ct 1976]) the *Duran* court noted its rules respecting the shackling of defendants also apply to the shackling of defense witnesses, although the prejudicial effects thereof are "less consequential." (*Duran, supra,* 16 Cal.3d at p. 288, fn. 4.) The *Kennedy* court stated: "The general rule for shackling witnesses is that a defendant has a right to have his witnesses appear free of shackles, except in special circumstances where there is evident danger of escape or harm to individuals in the courtroom. The decision whether to shackle witnesses is left to the sound discretion of the trial judge. The reason underlying the rule is the inherent prejudice to the defendant since it is likely the jury will suspect the witness's credibility. The prejudice factor toward the defendant, although much less than the situation where the defendant is shackled, provides a valid point of comparison even though the shackled witness cases do not directly affect the presumption of innocence." (*Kennedy, supra,* 487 F.2d at p. 105, fn. 5.)

Assuming, arguendo, that knowledge a person is currently incarcerated in prison permits an inference of diminished credibility, that inference is drawn by the jury as soon as they learn the witness is an inmate; the presence of shackles is superfluous to that concern. We readily admit the pres-

ence of shackles permits the inference that the witness is dangerous and has probably engaged in violent conduct in the past. However, our Supreme Court has acknowledged, " ' " " 'Acts of violence . . . generally have little or no direct bearing on honesty and veracity.' " ' " (*People* v. *Fries* (1979) 24 Cal.3d 222, 226 [155 Cal.Rptr. 194, 594 P.2d 19], quoting *People* v. *Rollo* (1977) 20 Cal.3d 109, 118 [141 Cal.Rptr. 177, 569 P.2d 771].) Even assuming, arguendo, that dangerousness permits an inference of diminished credibility, we note, once again, that the jury draws the inference as soon as it learns the witness is housed in a maximum security unit; the presence of restraints does not tell the jury anything significantly different from what it will learn anyway.

In sum, where testimony of an inmate witness is reasonably likely to disclose the witness is confined in a maximum security unit, we see no point in imposing *Duran's* rule (prohibiting restraints upon a showing of past violent conduct unrelated to behavior in the courtroom) on trial courts. The *Duran* rule, like most rules of procedure, involves a balancing of concerns. *Duran* speaks forcefully for a defendant's dignity. It also protects a defendant from the unfair inference that, because he is currently shackled, it is more probable he committed a violent crime in the past. But the *Duran* rule also contains elements of risk. By prohibiting trial courts from restraining inmate witnesses on the basis of verified past violent behavior, and by insisting that the witnesses first demonstrate an intent (by words or conduct) to escape or disrupt the proceedings of the court, *Duran* sanctions the possibility of an unannounced, unrestrained, violent first strike. Absent what we believe to be controlling authority, we would not impose that risk on trial courts facing the problem of hearing testimony from witnesses from a maximum security unit in a maximum security prison. That level of incarceration should suffice, in our view, to justify unobtrusive restraints on nondefendant inmate witnesses.

As we noted, the Supreme Court in *Duran* said, "The rules articulated hereinafter are applicable to the shackling of defendants and defense witnesses, since the considerations supporting use of physical restraints are similar in each instance. [Citation.]" (*People* v. *Duran, supra,* 16 Cal.3d at p. 288, fn. 4.) Defendant correctly points out that we cannot read the foregoing as dictum, since the Supreme Court had before it, inter alia, the trial court's denial of defendant Duran's motion to allow inmate witnesses to appear before the jury without restraints. (P. 288.) We believe *Duran's* rule must be applied by this court to the shackling of the witnesses in this case. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

Since the trial court based its decision to shackle defendant's witnesses solely on the violent backgrounds of the witnesses, and without any showing

that the witnesses would attempt escape or otherwise disrupt the proceedings of the court, the trial court erroneously abused its discretion. (*People v. Duran, supra,* 16 Cal.3d at pp. 292-293; *Solomon* v. *Superior Court, supra,* 122 Cal.App.3d at p. 536; *People* v. *Jacla, supra,* 77 Cal.App.3d at p. 885.)

However, we conclude the error is harmless by any standard. (*People* v. *Cecil* (1982) 127 Cal.App.3d 769, 779 [179 Cal.Rptr. 736]; *Solomon* v. *Superior Court, supra,* 122 Cal.App.3d at p. 538; *People* v. *Jacla, supra,* 77 Cal.App.3d at p. 891.) The record fails to show the jury ever saw the restraints imposed on the witnesses. Each of the four defense witnesses was impeached, without objection, by prior felony convictions. One testified inconsistently with his preliminary hearing testimony as to what he could see from where he was during the initial search of the cell block. One was directly and profanely contemptuous of the court when asked about prior convictions and untruthful in denying possession of a weapon in the prison. The third could not have been where he said he was when defendant was X-rayed. The fourth was admittedly in a position (a shower stall) where he could not see what was happening in the cell block. Assuming, arguendo, the jury saw their shackles, there is no possibility that, had there been no restraints, the jury would have believed them and discounted the X-ray evidence and prosecution testimony in this case.[6]

The judgment is affirmed.

Evans, Acting P. J., and Carr, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 4, 1984.

---

[6]Defendant also contends the trial court improperly delegated authority to the bailiff as to the nature of the restraints. (*People* v. *Jacla, supra,* 77 Cal.App.3d at p. 885.) Any error in that regard is similarly harmless. (*Id.,* at p. 891.)