[No. F018984. Fifth Dist. June 28, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDRE CENICEROS, Defendant and Appellant.

**[Opinion certified for partial publication.†]**

---

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 2 and 3.

COUNSEL

Richard Phillips and Rita Barker, under appointments by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, W. Scott Thorpe and Edgar A. Kerry, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BUCKLEY, J.—Defendant Andre Ceniceros appeals from conviction by jury trial of first degree murder and attempted murder, contending, inter alia, that the trial court's action in ordering defense witnesses shackled during their testimony denied defendant his constitutionally guaranteed "presumption of innocence" and precluded the jury from fairly evaluating the shackled witnesses' credibility. In the published portion of this opinion, we hold that, while the court erred in so ordering, shackling a witness does not implicate or directly affect defendant's presumption of innocence. Therefore, the error was harmless under the *Watson*[1] standard.

### STATEMENT OF FACTS

Just before midnight on June 29, 1991, Cassius Wade was in his two-door Pontiac Firebird "cruising" Mooney Boulevard in Visalia. His younger brother, Aaron, was in the front passenger seat; another younger brother, Robert, was seated in the rear seat directly behind Aaron; a friend, Yahsin Frausto, was in the rear middle seat; and another friend, Randy Langley, was in the rear seat behind Cassius. Meanwhile, defendant, Jamie Deloera, Bobby Palomo, Gilbert Garnica and Antonio Ramirez were "cruising" the same area in a black convertible. Deloera, Palomo and Ramirez were all members of the Southside Locos gang. The Firebird's occupants were Black; the convertible's occupants were Hispanic. Unfortunately, the two groups met, resulting in an altercation in which defendant shot Cassius and Aaron, killing Aaron and seriously wounding Cassius.

a. *Testimony of the Firebird's occupants.*

Cassius testified that they had exchanged words with the convertible's occupants a few minutes before they pulled into a driveway by the A & W

---

[1]*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].

and Wendy's restaurants on Mooney Boulevard. They pulled to the back behind Wendy's restaurant and parked. The convertible pulled up and parked in front of the Firebird. The convertible's driver got out and approached Cassius. Cassius testified that he told his brothers and friends not to get out of the car because "something might be happening." The driver approached Cassius and asked him why they were wearing "blue colors." Cassius got out of the Firebird and replied that they were "not wearing no colors to offend nobody." The other four passengers got out of the convertible and walked to the front of the Firebird. Aaron got out of the Firebird and stood behind the passenger door "talking over the window" to the group of "Mexican males." Aaron was "standing there saying something to them, and they were saying stuff back to him." Then, Cassius heard a shot. When he looked toward Aaron, he saw defendant reaching over the passenger door with his hand down toward Aaron who was lying on the ground. Cassius "went up over the hood" of the Firebird. Three of the Hispanics ran back to the convertible. As Cassius tried to "jump" defendant, he was shot in the head.

During cross-examination, Cassius admitted that prior to the shooting Aaron was probably doing "more than talking, probably starting some trouble by himself," and that he was moving his hands. Cassius also admitted there was an Easton baseball bat in the back of the Firebird which could be reached by anyone sitting in the backseat of the car. He denied telling anyone to get the bat. He admitted that Robert was holding a survival knife earlier in the evening and that he had tossed the knife into the back of the Firebird prior to the altercation. However, Cassius denied seeing anyone with the bat or a knife during the altercation.

Robert testified that after Cassius exited the Firebird, he heard Cassius tell the man who approached him that everything was "cool." Two other Hispanic men got out of the convertible and walked to the passenger door where Aaron was sitting. Aaron got out of the Firebird and stood behind the passenger door. Robert heard somebody in the background say " 'bust a cap in 'em.' " Defendant lifted up his shirt, pulled a black .22-caliber handgun out of his waistband and shot Aaron in the head. Robert testified that Aaron had placed a knife, identified as People's exhibit No. 4, in his fanny pack before they left for Visalia that evening. Aaron had this knife with him when he got out of the car.

Robert remained in the Firebird during the entire altercation. After the shooting, he went to help Aaron and saw the opened knife that Aaron had in his fanny pack on the ground beside him. However, he did not see Aaron waving the knife at anyone. Robert also admitted that he had a larger knife underneath the backseat of the Firebird and there was a baseball bat in the back of the car.

Robert testified that at no time during the altercation did he, Langley or Frausto have a weapon in their hands and that Cassius did not tell them to get the bat. Yet, during cross-examination, Robert admitted that "when Cassius got out of the car he said 'get the Easton,' meaning the bat, and Randy Langley grabbed that bat and had it in his hand while this altercation was going on." He also admitted that assault charges were pending against him and that in exchange for his testimony he hoped the district attorney would "go easy" on him.

Langley testified that the Firebird pulled up behind the convertible. After Cassius exited the Firebird to speak with one of the men, one "dude" approached the passenger side of the vehicle, followed by another person about five or six feet behind him. He grabbed the baseball bat and set it between himself and Frausto. Cassius and one of the "dudes" began talking. Approximately two or three minutes later, "that dude talking to Cassius told that dude talking to Aaron to 'bust a cap in 'em.' [¶] Then that's when he reached in his waistband, pulled out [a gun] and shot Aaron."

Langley testified that Aaron was behind the passenger door when defendant shot him and that defendant was approximately one foot away from Aaron when he pointed the gun over the door to aim at Aaron. Aaron was trying to duck back into the car when the shot was fired; Aaron was not waving his arms around. Langley saw three people exit the convertible that evening. Langley did not exit the Firebird until after Cassius was shot and the three men were running back to the convertible.

On cross-examination Langley testified defendant was two or three feet away from Aaron when he shot him. However, he admitted telling Officer Puder defendant was about 10 feet away from Aaron when the shooting occurred. He also told Puder that Aaron was walking toward the defendant when he was shot.

Frausto also testified the Firebird pulled up behind the convertible. Three "Mexican males" got out of the convertible. One approached the driver's side and two walked "up toward the car." Cassius got out of the Firebird, telling his passengers to "get the Easton." Langley grabbed the bat; however, he and Frausto stayed in the car. While Cassius was talking with one man, Aaron got out of the car and was standing by the door talking to the other two men. One of the men said " 'bust a cap in 'em.' " Langley was trying to get out of the driver's side of the Firebird. Then the defendant shot once and the bullet went over the car. Langley got back into the Firebird. The defendant then walked up to the front passenger door, and from a distance of approximately three feet, put his hand over the door and shot Aaron. Aaron

did not have a knife in his hand and he was not waving his arms. Defendant then shot Cassius. Frausto testified three shots were fired. After the shooting, he saw four Mexican males run to the convertible.

b.  *Testimony of the convertible's occupants.*

Robert Palomo testified that while they were "cruising Mooney" they drove by the Firebird. The individuals inside began "saying some stuff to us, and we couldn't hear it." They pulled into the street behind the Wendy's parking lot. The Firebird parked behind them; its occupants started yelling at them.

Everyone exited the convertible and approached the Firebird. Three of the occupants of the Firebird were out of the car at this time; another person exited the car later. Palomo was the first to speak, "ask[ing] them if they had a problem . . . all of us was ready to, you know, fight." With Gilbert Garnica beside him, Palomo approached the "black passenger." When they were approximately four or five feet apart, the passenger pulled a knife, swinging it but not wildly. The passenger was saying "come on" and "some other stuff." The front passenger door was between the "black passenger" and Palomo. Palomo testified there were two "black guys" close behind him. "One had a bat and the other one—the other one was doing some crazy karate kicks in there, telling us come on, you know." Palomo and Garnica turned around to return to the convertible. Palomo was afraid and felt he would be hurt if he stayed. Palomo admitted "we was gonna fight like, you know, with our hands," but when the passenger pulled out the knife they changed their minds and decided to go back to the convertible.

When they turned around, the "black passenger" moved out from behind the car door towards them. The man with the bat was right behind him. Defendant was walking toward the Black passenger. Ramirez was talking with Cassius; Deloera was out of the car by Ramirez. Palomo was about to get in the car when he heard two shots being fired. He did not see the shooting. After the shooting, they all drove back to Hanford. Along the way he saw defendant holding a gun and defendant told him he had shot two people and had to get rid of the gun. Defendant told them not to tell anyone about the incident, but he did not threaten anyone.

Jaime Deloera was the driver of the convertible. He testified that after parking the car he exited the convertible with the others but did not approach the Firebird because he was "turning off the radio." He did see "one of the black guys" on the passenger's side waving a knife at Palomo, threatening him. The man with the knife was standing by the front fender of the Firebird,

"[a]lmost by the hood." Defendant was a few feet behind Palomo. Deloera saw the Firebird's driver getting out a bat so he turned back to the convertible looking for a bat or crowbar. He heard but did not see shots being fired. He was scared and told everyone to get in the car. They left the scene and drove back to Hanford. He believed the Firebird's occupants were members of the Crips, a rival gang.

Antonio Ramirez testified that after they stopped in the parking lot the convertible was hit from behind by the Firebird. He got out of the car, approached the Firebird's driver and spoke with him, saying there was no problem. He then saw a man exit the Firebird. This man "[m]oved around up to the front dancing karate," while holding a knife in his hand. This man was "stepping at" Garnica and Palomo. Ramirez also saw someone with a bat. He turned to talk with the driver and then heard a shot. He then ran back to the convertible. Everyone was already at the car when he got there.

On cross-examination, Ramirez did not remember telling Puder he saw defendant jump in the front seat of the convertible holding a gun or that defendant told them, " 'This doesn't go out between any of us. If it does come out of anyone, you know, you know what the consequences are.' " Ramirez said defendant did not threaten them; rather, "we just said that we would come to an agreement that no one would say anything," because "it's just that it's like instinct . . . it's in the bar rules."

Gilbert Garnica testified that when the convertible crossed the exit to go onto Mooney Boulevard the occupants of the Firebird called them names and they responded in like fashion. When they pulled into the driveway, the Firebird followed them all the way around the parking lot. When the convertible pulled up, the Firebird quickly stopped about five feet away from them, slamming on the brakes. Four people exited the Firebird, making racial slurs. He felt they were trying to start a fight. Garnica and Palomo approached the passenger side of the Firebird. Then he saw that the person who exited the front passenger door was holding a knife. Another Black man was a few feet behind the man with the knife, kicking and making "karate" moves. A man exited the backseat through the driver's door with a bat in his hand. The man with the knife came around the passenger door toward the front of the car toward him. Garnica thought the man with the knife was trying to stab him and felt he was in danger. When the man with the knife reached the front end of the passenger door, Garnica turned and ran back to the convertible. When he turned, defendant was about a foot behind him. Garnica thought defendant was approximately four or five feet away from the man with a knife. He heard but did not see two shots fired.

Garnica admitted telling Puder defendant was approximately seven or eight feet away when he shot "the black guy," although he could not be

precise. He also admitted that defendant's hand was on the gun when he passed by and that he saw defendant draw his gun as he was approaching the man with a knife. However, "the black guy was moving towards [defendant], too." After an initial denial, he admitted telling Puder they made an agreement not to say anything about the incident. Also contrary to his testimony at trial, he told Puder that he was not drunk at the time of the incident.

Defendant testified that as they were about to leave, the Firebird drove in and the two vehicles nearly collided. The other car pulled around them and its occupants hung out of the window and "started like cussing at us and flipping us off and stuff." Both cars parked with the Firebird behind the convertible. The Firebird's occupants continued to yell and make motions at them, "like to come out of our car." Defendant and his friends exited the convertible. Defendant had the gun in his waistband for protection, but he did not intend to shoot anybody. Defendant moved toward the Firebird behind Palomo and Garnica. Two people exited the Firebird on the passenger side and started walking toward them. One of them had a knife in his hand and was jumping around like a boxer, telling them "to come on, that he had something for us." The other man was hitting a baseball bat against his hand. At the same time, another man exited the driver's side of the Firebird and moved his hand like he was trying to hide something. Ramirez and Garnica were telling the "black passenger" with the knife to "be cool" and put the knife down. Palomo and Garnica turned around and went back to the convertible. The passenger initially backed up but when defendant told him to "calm down," he advanced and said, " 'I'm gonna get you, come on.' " The passenger moved past the door toward the front of the car until he was approximately three feet in front of the defendant. Another man was directly behind him, swinging the bat. Defendant was afraid he was going to get stabbed so he pulled his gun from the waistband and shot the man holding the knife. Defendant did not intend to kill him, and he did not aim at his head. The man backed up to the side of the door and fell sideways on the ground. Defendant then shot at the feet of the man with the bat who ran behind the car. Defendant heard someone say "he was gonna get me." Defendant turned and saw another person with his hands up about to attack him. Defendant shielded himself thinking the other man had "a stick or something" and then shot him. Defendant ran to the convertible and he and his friends drove back to Hanford. During the drive "we were all scared to go to jail and stuff, and we just decided not to tell anybody at all about what happened."

c. *The physical evidence.*

Tim Sola, senior identification technician for the Visalia Police Department, testified that he was called to the scene of the shooting. He found an

Easton brand aluminum softball bat in the Firebird. Its grip was protruding from the right side passenger doorway. An open knife was found at the scene by another officer and a larger hunting knife in a sheath with the snap closed was found "on the rear deck behind the rear seat of the [Firebird]." He also found a razor blade knife in a zipped fanny pack which belonged to Aaron in the console of the car.

Officer Gary James of the Visalia Police Department was one of the first officers to arrive at the scene. He observed two Black males, one of whom was in front of the Firebird, "laying in the parking lot. The second one was seated in the passenger's seat of the vehicle." He found an open knife on the pavement "adjacent to the open passenger door of the vehicle under the edge of the door toward the rear portion of the door" in front of the right rear tire. He also found a baseball bat, the end of which was protruding out from the car doorway.

DISCUSSION

1. *Shackling of two defense witnesses.*

   a. *Factual background.*

Antonio Ramirez and Gilbert Garnica were both in state custody at the time they testified for the defense. Ramirez was serving a term at the Department of Corrections, Vacaville, for a 1992 conviction of felony escape from the California Youth Authority (YA). Garnica was in custody at YA. The record does not indicate the nature of his underlying offense. Both Ramirez and Garnica were shackled with leg irons during their courtroom appearances.

Four prosecution witnesses were also in custody at the time they testified. Cassius was in county jail for felony conviction of violation of Health and Safety Code section 11351. He had suffered another drug possession conviction and had also been convicted of possession of a firearm and had twice been convicted of "drunk driving." He had also been arrested for assault upon a police officer. Robert Wade, Randy Langley and Yahsin Frausto were all in juvenile hall pending hearings on allegations of assault with a deadly weapon. None of these prosecution witnesses was shackled.

Defense counsel objected to the shackling, arguing it would imply "to the jury that my witnesses are obviously much more dangerous," than the prosecution witnesses and that this would "have a strong bearing on their believability to the jury." The court immediately ruled as follows: "The court

would be—finds that it would be a risk to the court and—to bring these state prisoners in without being manacled." The prosecution then stated: "The only thing I was gonna say is the difference is, of course, the prosecution witnesses were not state prisoners. They were just in local custody." The court replied, "All right." After reiterating, "These gentlemen are not gonna be in my courtroom without some restraints such as leg chains," the court stated, "I've discussed this with the bailiff, and—we cannot maintain security without this precaution."

Defense counsel then requested the jury be instructed that they were not to infer Ramirez and Garnica are "particularly any more dangerous than any other witness[es]" because they are shackled. The court agreed to "tell the jury that the fact they're in manacles will be disregarded by them as far as credibility is concerned. They're not to discuss the matter in their deliberations or consider it in any way on their credibility; all right?" Defense counsel replied, "Fine."

Defense counsel filed a declaration as part of the proceedings to effect a settled statement regarding circumstances of the witness shackling not reflected on the record during trial which stated that, "[he] had requested that witnesses Garnica and Ramirez be brought to and from the witness stand outside the presence of the jury, so as to minimize the prejudicial effect of the shackling upon the witnesses' credibility. Judge Moran denied this request. The ruling was made off the record." The agreed settled statement executed by the prosecutor, defense counsel and the trial court recites, "The court does not recall defense counsel's requesting that witnesses Garnica and Ramirez be brought to and from the witness stand outside the presence of the jury so that the shackles would be less apparent. However, the court would not have granted this request." The statement also recites that Ramirez and Garnica "appeared in court and testified dressed in prison garb, shackled in leg irons, and were brought to and from the witness stand from across the courtroom in full view of the jury." The four prosecution witnesses "were not brought to the courthouse in shackles, and they were not shackled in the courtroom. They were dressed in suits and ties when they testified because their parents had brought this clothing to the institutions in which they were confined."

Prior to direct examination of Ramirez, the court gave the following admonition:

"Ladies and gentlemen, before this witness testifies, let me explain to you that he is a—a state prisoner, and I have required that he wear shackles on his feet for security reasons in this courtroom.

"The fact that he has shackles on his leg is not to be considered by you as reflecting on his credibility, nor are you to discuss the fact that he's chained in—in your deliberations."

No admonition was given prior to Garnica's testimony.

b. *Abuse of discretion.*

The People concede the shackling was erroneous because the court failed to "demonstrate a manifest need to shackle these witnesses"; however, they contend this error was harmless because neither witness was crucial or credible and "the evidence against appellant was quite strong if not overwhelming." Defendant disputes both of the People's arguments, contending Garnica and Ramirez were important defense witnesses and the evidence against defendant's claim of self-defense "was not conclusive, nor overwhelming, nor was it particularly clear or strong."

A trial court is vested with discretion to order suitable physical restraint. However, because of the "possible prejudice in the minds of the jurors, the affront to human dignity, the disrespect for the entire judicial system which is incident to unjustifiable use of physical restraints, as well as the effect such restraints have upon a defendant's decision to take the stand," a defendant may not "be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People* v. *Duran* (1976) 16 Cal.3d 282, 290-291 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1], hereafter *Duran.*) And "in any case where physical restraints are used those restraints should be as unobtrusive as possible, although as effective as necessary under the circumstances." (*Id.* at p. 291.) Without "a record showing of violence or a threat of violence or other nonconforming conduct," the imposition of physical restraints "will be deemed to constitute an abuse of discretion." (*Ibid.*) These rules are applicable to the shackling of defense witnesses, "since the considerations supporting use of physical restraints are similar in each instance." (*Id.* at p. 288, fn. 4.)

"Courts of Appeal have generally read *Duran* as requiring that a defendant make specific threats of violence or escape from court or demonstrate unruly conduct in court before in-court restraints are justified." (*People* v. *Valenzuela* (1984) 151 Cal.App.3d 180, 192 [198 Cal.Rptr. 469].) As stated in *People* v. *Cox* (1991) 53 Cal.3d 618, 651-652 [280 Cal.Rptr. 692, 809 P.2d 351], "While no formal hearing as such is necessary to fulfill the mandate of *Duran,* the court is obligated to base its determination on facts, not rumor and innuendo . . . ."

■ Here, there was no showing of manifest need to support the shackling. The trial court's repeated references to the fact Garnica and Ramirez were in "state custody" indicates that it may have been acting in adherence to a general policy of shackling all inmates in state custody. Such a policy would clearly be improper. (*Duran, supra,* 16 Cal.3d at p. 293; *People* v. *Zatko* (1978) 80 Cal.App.3d 534, 551 [145 Cal.Rptr. 643].) "[T]he trial judge must make the decision to use physical restraints on a case-by-case basis." (*Duran, supra,* 16 Cal.3d at p. 293.)

The only explicit reason given by the trial court for the restraints was that it had spoken with the bailiff and determined "we cannot maintain security" without them. The contents of the court's conversation with the bailiff were not disclosed. There are no facts in the record to support the conclusion that these witnesses posed a threat of violence or nonconforming conduct in the courtroom. Absent such a showing, the imposition of physical restraint was improper and the court erred in so ordering. (Cf. *People* v. *Valenzuela, supra,* 151 Cal.App.3d at pp. 195-196.)

    c. *Harmless error.*

■ The standard to be applied in determining whether the erroneous shackling of a defense witness requires reversal has not been expressly articulated in any of the cases which have addressed this shackling issue. ■ Federal constitutional error is tested under the standard enunciated in *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065] (hereafter *Chapman*) which requires reversal unless the error is "harmless beyond a reasonable doubt." (*Id.* at p. 24 [17 L.Ed.2d at p. 711].) The *Chapman* test has also been applied where the error did not result in the deprivation of a specific constitutional right, such as the right to counsel, but was so significant it infected "the trial with unfairness as to make the resulting conviction a denial of due process." (*Donnelly* v. *DeChristoforo* (1974) 416 U.S. 637, 643 [40 L.Ed.2d 431, 437, 94 S.Ct. 1868].) If the error does not implicate a constitutional right, it is tested under the less stringent standard announced in *People* v. *Watson, supra,* 46 Cal.2d 818 (hereafter *Watson*). *Watson* mandates reversal only if the error resulted in a "miscarriage of justice." Such a miscarriage occurs when "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Id.* at p. 836.)

■ *Duran* itself expressly declined to state whether the *Chapman* test is applicable to erroneous shackling. (*Duran, supra,* 16 Cal.3d at p. 296, fn. 15.) However, because shackling affects the presumption of innocence, it has recently been held that if a *defendant* is restrained and the jury sees the

defendant in this condition, the error is of constitutional significance and is tested under the *Chapman* standard. If the jury does not see the defendant restrained, "[t]he potential effect on the presumption of innocence is eliminated," and the error "should therefore be tested under the *Watson* test." (*People* v. *Jackson* (1993) 14 Cal.App.4th 1818, 1829 [18 Cal.Rptr.2d 586].) However, the *Jackson* court did not address the improper shackling of a defense witness.

In *Duran*, the Supreme Court wrote that the prejudicial effect of shackling defense witnesses is less consequential than that suffered if the defendant is personally restrained. (*Duran*, *supra*, 16 Cal.3d at p. 288, fn. 4.) The court relied upon *Kennedy* v. *Cardwell* (6th Cir. 1973) 487 F.2d 101, in which the federal appellate court wrote, "The decision whether to shackle witnesses is left to the sound discretion of the trial judge. The reason underlying the rule is the inherent prejudice to the defendant since it is likely the jury will suspect the witness's credibility. The prejudice factor toward the defendant, although much less than the situation where the defendant is shackled, provides a valid point of comparison even though *the shackled witness cases do not directly affect the presumption of innocence*." (487 F.2d at p. 105, fn. 5, italics added.)

In *People* v. *Valenzuela*, *supra*, 151 Cal.App.3d 180, the limited effect restraints have upon a jury's perception of an incarcerated witness's credibility was discussed: "*Assuming, arguendo, that knowledge a person is currently incarcerated in prison permits an inference of diminished credibility, that inference is drawn by the jury as soon as they learn the witness is an inmate; the presence of shackles is superfluous to that concern.* We readily admit the presence of shackles permits the inference that the witness is dangerous and has probably engaged in violent conduct in the past. However, our Supreme Court has acknowledged, ' " ' "*Acts of violence . . . generally have little or no direct bearing on honesty and veracity.*" ' " ' [Citation.] Even assuming, arguendo, that dangerousness permits an inference of diminished credibility, we note, once again, that the jury draws the inference as soon as it learns the witness is housed in a maximum security unit; the presence of restraints does not tell the jury anything significantly different from what it will learn anyway." (151 Cal.App.3d at pp. 194-195, italics added.) Thus, shackling a witness does not directly affect the presumption of a defendant's innocence and weighs little in the assessment of his or her credibility. (Cf. *People* v. *Froehlig* (1991) 1 Cal.App.4th 260, 264 [1 Cal.Rptr.2d 858] [effect of a witness testifying in prison clothes is less prejudicial that a defendant testifying in similar garb as it does not affect the presumption of innocence or carry the inference defendant is a person

disposed to commit crimes].)[2] Moreover, improper restraint of a witness does not affect the defendant's decision to take the stand, impede his ability to confer with counsel or otherwise significantly affect trial strategy. For these reasons, we conclude the erroneous shackling of a defense witness under the circumstances presented here does not result in the deprivation of a specific federal constitutional right or so impair the trial process that it resulted in a deprivation of due process. Therefore, the effect of this error must be evaluated under the *Watson* standard.

■ In application of the *Watson* standard, it must first be acknowledged that this is not a case with overwhelming evidence in support of the conviction. Rather, the testimony of the witnesses in the Firebird sharply conflicted with that given by those in the convertible. However, as we shall explain, other evidence, including the testimony of uninvolved bystander witnesses, as well as an admonition given to the jury by the court, provide ample reason to conclude the error was harmless.

The People's case was strong. None of the bystanders saw Aaron advancing toward defendant. They testified it was the "Mexicans" who were approaching and trying to start a fight. Garnica himself admitted that the defendant was pulling a gun out of his waistband while approaching Aaron. Aaron's body was found in the seat of the Firebird. Cassius was unarmed. As previously noted, Garnica also testified that defendant was pulling a gun out of his waistband as he approached Aaron, a fact which assisted the prosecution and weighed against a finding of self-defense.

Six bystander witnesses testified as to the chain of events that occurred during and after the confrontation. None of them observed the passengers of the Firebird to have any weapons.[3] All but one saw someone from the convertible with a gun. Several witnesses, either directly at trial or through testimony at the preliminary hearing used for impeachment, testified that one of the passengers was making "some kind" of "karate moves." A summary characterization of the bystander testimony is that defendant and his group were far more aggressive than the victims and the other passengers of the Firebird.

Also important is the fact that the jury learned more of the violent nature of the Firebird's occupants than they did of the occupants of the convertible.

---

[2]We note that the *Froehlig* court, after first finding no abuse of discretion in the trial court's denial of defendant's motion to observe how the witness was dressed prior to testifying, stated that even if this were error, it would be harmless beyond a reasonable doubt. (*People* v. *Froehlig, supra*, 1 Cal.App.4th at p. 266.) We do not deem this statement as a persuasive reason to apply *Chapman* as it was neither critical to the holding nor supported by any analysis or discussion.

[3]Denise Leon, one of the bystanders, did not remember telling a defense investigator that she later saw a baseball bat on the ground.

Greater emphasis was placed upon the crimes committed by prosecution witnesses and more detail of their crimes was given to the jury than the offenses for which Garnica and Ramirez were incarcerated. The jury learned Cassius was in custody for possession of narcotics and that he had another previous conviction for this offense and had twice been convicted of drunk driving and once convicted of possession of a firearm. They also learned he had been recently arrested for assault upon a police officer. The jury also learned that Robert, Langley and Frausto were incarcerated at juvenile hall pending disposition of charges of assault with a deadly weapon. In contrast, all the jury heard about Ramirez's criminal record was that he was in prison for escape from YA. They heard nothing about Garnica's offense and, other than the shackling, there were no inferences that it was of a violent nature.

Moreover, as was explained in *Valenzuela*, prejudice arises in the mind of the jury "as soon as they learn the witness is an inmate," regardless of whether the witness is. restrained. (*People* v. *Valenzuela, supra,* 151 Cal.App.3d at p. 194.) Therefore, despite the fact only Garnica and Ramirez were shackled, the jury was as likely to doubt the credibility of the Firebird's occupants as they were to doubt Garnica and Ramirez. The effect of the "disparate treatment" between prosecution and defense witnesses was minimal.

In *U.S.* v. *Milner* (9th Cir. 1992) 962 F.2d 908, the Ninth Circuit Court of Appeals held that while the trial court erred by calling attention to the fact the defendant was flanked by two marshals for security sake, it had "sanitized" the error by instructing the jury that the fact the defendant was in custody should not enter into their deliberations. (*Id.* at p. 912.) Likewise, here, the trial court admonished the jurors they were not to consider the presence of shackles in assessing the credibility of a witness and not to discuss the fact the witness was "chained" in their deliberations. The jury is presumed to have followed the direction of the court and obeyed the law. (Cf. *People* v. *Ryan* (1981) 116 Cal.App.3d 168, 179 [171 Cal.Rptr. 854].)

Defendant now contends this admonition was insufficient because it did not specifically inform the jurors that restraints have no bearing on defendant's guilt. However, at trial, defense counsel agreed this admonition was "Fine."[4] Since the defendant himself was not restrained and the shackling of witnesses does not affect the defendant's presumption of innocence, the

---

[4]Although no such admonition was given prior to Garnica's testimony, defendant does not contend such a distinction was critical. He argues the admonition given was insufficient to cure the court's order shackling the two witnesses. In any event, it is unlikely that a second admonition given prior to Garnica's testimony would have added much as the two were shackled similarly.

admonition was adequate as given. (*Kennedy* v. *Cardwell, supra,* 487 F.2d at p. 105, fn. 5; *People* v. *Valenzuela, supra,* 151 Cal.App.3d at p. 194.)

Therefore, as we conclude that the prejudice resulting from the improper shackling was not so great that it resulted in a miscarriage of justice, reversal is not required. (*People* v. *Valenzuela, supra,* 151 Cal.App.3d at p. 196; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1264 [232 Cal.Rptr. 849, 729 P.2d 115].)

2., 3.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### DISPOSITION

The judgment is affirmed.

Ardaiz, Acting P. J., and Thaxter, J., concurred.

A petition for a rehearing was denied July 21, 1994, and appellant's petition for review by the Supreme Court was denied October 13, 1994.

---

*See footnote, *ante,* page 266.