[No. C049453. Third Dist. July 31, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES MICHAEL VANCE, Defendant and Appellant.

**COUNSEL**

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Stephen G. Herndon and Paul E. O'Connor, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CANTIL-SAKAUYE, J.**—In 1984, 23-year-old defendant James Michael Vance attacked his mother with a meat cutter saying, "Your [*sic*] a clone, you're not my mother." Defendant had been in treatment for mental illness off and on since he was 17. Pursuant to a stipulation of the parties, defendant pled not guilty by reason of insanity to the charge of attempted murder (Pen. Code, §§ 187 & 664).[1] The court ordered defendant confined in a state hospital for the mentally disordered for a maximum term of nine years pursuant to section 1026.

On October 4, 2004, the People filed their most recent section 1026.5 petition to extend the maximum time of defendant's commitment. Defendant

---

[1] Undesignated statutory references are to the Penal Code.

requested a jury trial. The jury found defendant was "a person who by reason of a mental disease, defect or disorder represent[ed] a substantial danger of physical harm to others . . . ." On March 2, 2005, the court ordered defendant's commitment extended by two years pursuant to section 1026.5, subdivision (b)(8).

On appeal, defendant contends he is entitled to reversal and remand for a new trial because: (1) the court unlawfully denied defense counsel's request that defendant's shackles be removed at trial; and (2) defendant was denied effective assistance of counsel when trial counsel allowed him to appear in institutional clothing. We agree the court prejudicially erred in allowing defendant to appear in shackles. Accordingly, we reverse the judgment. Given this resolution, we need not reach defendant's second claim of error.

## FACTUAL AND PROCEDURAL BACKGROUND

The following exchange took place immediately before the court invited prospective jurors into the courtroom:

"[DEFENSE COUNSEL]: I'm asking if [defendant] could be unshackled.

"THE COURT: I don't make that decision.

"[DEFENSE COUNSEL]: Well, I know what Paul is going to say.

"THE BAILIFF: Correct."

Thereafter, the court informed prospective jurors that they would be asked to decide, "whether or not, because of [defendant's] mental condition, he represents a danger to himself and others." The following exchange took place during voir dire of prospective Juror No. 54714:

"[DEFENSE COUNSEL]: As my client sits here today, do you feel a danger from him?

"JUROR NO. 54714: No—not without hearing what happened.

"[DEFENSE COUNSEL]: Okay. But just looking at him, the way he looks, you know?

"JUROR NO. 54714: He looks fine. He got the shackles on his feet. You know, he looks—he's not going to get me. [¶] . . . [¶] If he was that good, why are the shackles on his feet?

"THE COURT: Well, that's a good point. None of the jurors can take into account how he looks, and whether or not he has a prison uniform on and whether he has shackles.

"JUROR NO. 54714: I don't mind the prison uniform.

"THE COURT: All right. I'm just addressing everybody, not just you? [¶] . . . [¶] So I need your assurance that you wouldn't let that fact in any way, judge the defendant. Does anybody have a problem with that? And . . . whether or not to use restraints is a decision made by the law enforcement people. It's not my decision. And you shouldn't let that influence you at all. They could be dead wrong, that he doesn't need shackles. I don't know. Anybody have a problem with that? Okay. [Defense Counsel]?

"[DEFENSE COUNSEL]: Thank you, Your Honor."

Dr. Jeykhosrow Rastegari, the staff psychiatrist who had been treating defendant at Napa State Hospital (NSH) since August 2004, testified regarding defendant's diagnosis and treatment. Rastegari stated that defendant suffered from a schizo-affective disorder which included a psychotic component, nonreality-based thinking, bipolarity, impulsiveness, aggressiveness, and extreme irritability. His diagnosis also included polysubstance abuse.

According to Dr. Rastegari, defendant had not fully complied with his substance abuse treatment. He testified that polysubstance dependence has a "big role" in destabilizing a psychotic patient. Defendant was readmitted to NSH in May 2004 because of marijuana use in violation of the terms of his conditional release. Rastegari explained that marijuana can cause psychotic thinking and patients who use illegal substances frequently fail to take their antipsychotic medications and therefore relapse. Defendant substituted marijuana for his medications.

Rastegari cited 15 episodes between May 2004 and the time of trial in February 2005 where defendant required intervention in the form of sedative hypnotic medication. At times, defendant also required placement in a locked room to control his agitation and assaultive behavior. Staff put defendant in restraints on one occasion during this period.

On January 4, 2005, defendant was on the telephone with his mother and became very angry and agitated when another patient interrupted the conversation. Staff administered a hypnotic agent. Dr. Rastegari stated this incident was a "very concerning matter" because "if the patient is in community, and such a mode of intervention cannot be given, the patient is a great risk not to be able to control his anger and agitation."

Dr. Rastegari also testified that defendant had not fully complied with his anger management program, refusing to attend some of the treatment sessions. Defendant directed aggressive language toward staff on multiple occasions. According to Rastegari, defendant also demonstrated his irritability, impulsivity and lack of control by banging on walls, doors, medication trays, trash cans and dinner trays, and by throwing chairs. In one case, defendant displayed manic behavior by yelling, screaming, dancing, singing and laughing uncontrollably in the rain in an outdoor courtyard.

In Dr. Rastegari's opinion, defendant posed a danger to others in the community "[b]ased on his impulsivity, aggressive behavior, and lack of insight into his illness." Rastegari cited the multiple instances of agitation and aggressive outbursts during treatment, which required intervention by staff, as examples of the danger he posed. Although defendant took Haldol at his own request on a number of occasions, Rastegari indicated the drug was not ordinarily used in a community setting. He was also concerned that Haldol did not always work quickly to calm defendant, even in an emergency situation.

On cross-examination, Dr. Rastegari acknowledged that defendant had made some progress and "the degree of assaultive and aggressive behavior . . . [had] improved to a degree, since May of 2004." He testified defendant's impulsivity, aggressiveness and lack of insight into his illness were symptoms of his psychotic diagnosis. Dr. Rastegari also acknowledged that defendant: (1) never injured anyone during his 21 years of hospitalization; (2) did not assault anyone when he decompensated in May 2004;[2] and (3) did not assault his wife when he was having marital problems during the same period.

On redirect examination, Dr. Rastegari testified that defendant's mental disorder could be managed but not cured. He stated it was possible that the delusions which caused defendant's 1984 attack on his mother could recur if defendant "stopped taking his medications, starts smoking marijuana or drinking alcohol, or using some other illicit drug."

Defendant's mother, Mary Vance, testified for the defense. She described defendant's attack on her in 1984 and the January 4, 2005 telephone incident at NSH.

The court addressed the jury before defendant took the witness stand in his own defense.

---

[2] Decompensation is the destabilization of a person suffering from chronic psychotic illness. Dr. Rastegari testified that the patient "[m]ight be stabilized, for a few years. And due to non-compliance, or other factors, might get destabilized and need psychiatric hospitalization. So get stabilized, and be discharged, back to community."

"THE COURT: I want to remind you, ladies and gentlemen, what I told you last week. I have no control over whether or not the defendant is manacled. And you'll note that he is. But please do not take that into account, in any way whatsoever, as to whether or not he's a danger to others. [¶] The decision to do that is made by the peace officers, not by me, not by counsel. So disregard that. I know that's hard to do, but I'm going to ask you to try really hard to do that. All right. [Defense counsel]?

"[DEFENSE COUNSEL]: Thank you, Your Honor."

Thereafter, defendant testified he was currently taking Depacote for mood swings, Risperdal for his thought disorder, and Wellbutrin for depression. Before being hospitalized at NSH in May 2004, defendant lived with his wife in Ukiah. He and his wife had similar mental health diagnoses and took similar medication. Defendant had been taking his medication, but smoked three marijuana cigarettes he found at work. Not wanting to get caught, he used "Golden Seal" to clean out his system. Defendant testified he believed the herb also cleaned out his medication and got him off balance.

After defendant was arrested, he was placed in a rubber room. He sang for a while, then got upset. Defendant felt he had been set up to go back to the hospital. He was naked when five security officers came to the door and said they were going to give him medicine. Defendant told the officers they would have to shoot him and took up a karate stance. Defendant testified he did not know any karate and would not have used it on the officers. They shot him with a taser and injected him with a tranquilizer. Defendant acknowledged the officers legitimately viewed his behavior as assaultive because of the karate stance.

Defendant testified he had not, to his knowledge, hurt anyone since 1984. At the same time, defendant testified he had been involved in a couple of scuffles with other patients and had been restrained at the hospital.

If released from NSH, defendant planned to return to Mendocino County where he had friends and support groups. He described the programs that could assist him.

On cross-examination, defendant acknowledged the June 25, 2004 incident when he became very angry and went into seclusion. He spent a period of time yelling, screaming and banging on the screen before staff restrained him with harnesses. Defendant did not remember the incident because he was in his manic phase.

Defendant also acknowledged he had a problem with people who did not understand English because they tended to misinterpret things he said due to

the language barrier. He denied having problems with the Filipino staff simply because they were Filipino.

Defendant attributed some of his recent problems to something akin to midlife crisis where he found himself questioning what his life was all about. He stated, "I was 48 years old, and felt that I had not accomplished anything that I had dreamt or desired as a child, as a young person. . . . [¶] And so then I felt like I was running out of time. And so I started staying up, trying to accomplish what I was trying to create this art business for myself." This was when he found and started using the marijuana. Defendant acknowledged a pattern of sabotaging himself.

The following exchange took place between the court and defendant at the close of testimony:

"THE COURT: If you're released, would you be needing meds, do you think?

"[DEFENDANT]: Yes.

"THE COURT: How would you undertake to make sure that you take them?

"[DEFENDANT]: Well, I take—I take the majority of them at night. And the rest in the morning. It's just a matter of two times a day. [¶] . . . [¶]

"THE COURT: So you would do it yourself? In other words, you would decide how you were going to actually take those meds?

"[DEFENDANT]: Yes.

"THE COURT: Make sure you took them?

"[DEFENDANT]: Yes."

The court did not formally instruct the jury regarding defendant's physical restraints.[3]

---

[3] CALJIC No. 1.04, which is used in criminal trials, reads: "The fact that physical restraints have been placed on defendant [] must not be considered by you for any purpose. They are not evidence of guilt, and must not be considered by you as any evidence that [he] [she] is more likely to be guilty than not guilty. You must not speculate as to why restraints have been used. In determining the issues in this case, disregard this matter entirely."

## DISCUSSION

■ The parties agree on the law governing the use of physical restraints at criminal trials. "[A] defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran* (1976) 16 Cal.3d 282, 290–291 [127 Cal.Rptr. 618, 545 P.2d 1322] (*Duran*); see also § 688 ["No person charged with a public offense may be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge"].) " 'Manifest need' arises only upon a showing of unruliness, an announced intention to escape, or '[e]vidence of any nonconforming conduct or planned nonconforming conduct which disrupts or would disrupt the judicial process if unrestrained . . . .' " (*People v. Cox* (1991) 53 Cal.3d 618, 651 [280 Cal.Rptr. 692, 809 P.2d 351] (*Cox*), quoting *Duran, supra,* at p. 292, fn. 11.) "Moreover, '[t]he showing of nonconforming behavior . . . must appear as a matter of record . . . . The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion.' " (*Cox, supra,* at p. 651, quoting *Duran, supra,* at p. 291.) The burden is on the People to establish in the record the manifest need for the shackling. (*People v. Prado* (1977) 67 Cal.App.3d 267, 275 [136 Cal.Rptr. 521].) "The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion." (*Duran, supra,* at p. 291.)

■ California law also makes clear the court must make its own independent determination regarding restraints and cannot rely solely on the opinion of court security personnel. (*People v. Mar* (2002) 28 Cal.4th 1201, 1218 [124 Cal.Rptr.2d 161, 52 P.3d 95] (*Mar*).) " '[*Duran*'s] emphasis that a showing exist on the record of "manifest need" for shackles presupposes that it is the trial court, not law enforcement personnel, that must make the decision an accused be physically restrained in the courtroom. A trial court abuses its discretion if it abdicates this decision-making authority to security personnel or law enforcement. [Citations.]' . . . The record must demonstrate that the trial court independently determined on the basis of an on-the-record showing of defendant's nonconforming conduct that 'there existed a manifest need to place defendant in restraints.' [Citation.]" (*Ibid.*)

The People concede that, "the trial court erred in failing to properly exercise its discretion," but argue defendant waived the issue on appeal.[4] First, they contend "[d]efense counsel merely asked if [defendant] could be

---

[4] Where a defendant fails to tender a theory or argument in the trial court, the proper term is "forfeiture." The term "waiver" refers to the intentional relinquishment of a known right. (*People v. Saunders* (1993) 5 Cal.4th 580, 590, fn. 6 [20 Cal.Rptr.2d 638, 853 P.2d 1093].)

unshackled" and suggest, without citation to authority, that defense counsel was required to cite case law in support of the oral request. We conclude defense counsel's request was sufficient to preserve the shackling issue for appeal.

Second, the People note that the court admonished the jury before defendant testified that the jury was not to consider the fact defendant was manacled, and defense counsel thanked the court. The People suggest that, "defense counsel may have thanked the court to indicate his approval of the instruction, or he may have thanked the court as a way of acknowledging the opportunity to examine the witness. If defense counsel was approving the instruction, then [defendant's] claim has been waived." We agree with defendant that "[t]he mere fact that [the People] cannot determine why trial counsel thanked the court should be reason enough not to imply a waiver."

Alternatively, the People argue we need not reach the merits of the shackling issue because "[i]t is arguable that the criminal law jurisprudence regarding shackling should not be extended to this civil case." They cite *People v. Beeson* (2002) 99 Cal.App.4th 1393 [122 Cal.Rptr.2d 384] (*Beeson*), which notes courts have rejected attempts to extend specific procedural safeguards— namely, the prohibition against ex post facto laws, the right against compulsory self-incrimination, and the right to personally waive jury trial—to mentally disordered offender (MDO) proceedings. (*Id.* at pp. 1406–1407.) *Beeson* does not mention the use of physical restraints.

The People acknowledge that *People v. Fisher* (2006) 136 Cal.App.4th 76, 80 [38 Cal.Rptr.3d 540] (*Fisher*), recently held that *Duran* applies in MDO proceedings, but argue the court "provided no analysis for this holding." In *Fisher,* the court affirmed the jury verdict, finding defendant forfeited any claim of error by failing to object to wearing a leg restraint. The court also ruled that any error was harmless given evidence in the record that defendant was an escape risk and no evidence that the jurors were aware of the shackles. (*Id.* at pp. 79, 80.) We agree with the *Fisher* court that *Duran*'s requirements for the use of physical restraints should apply in jury trials under section 2960 et seq., and therefore by analogy to jury trials under section 1026.5. By citing *Duran,* the *Fisher* court impliedly held that the use of physical restraints involves rights of a different order than those cited by *Beeson* as ordinarily not accorded defendants in civil proceedings. *Duran* recognized "it is manifest that the shackling of a criminal defendant will prejudice him in the minds of the jurors. When a defendant is charged with any crime, and particularly if he is accused of a violent crime, his appearance before the jury in shackles is likely to lead the jurors to infer that he is a violent person disposed to commit crimes of the type alleged. [Citations.]" (*Duran, supra,* 16 Cal.3d at p. 290.) Here, as in the MDO proceeding in

*Fisher*, the jury was asked to determine whether defendant represents a substantial danger of physical harm to others (§§ 1026.5, subd. (b)(1), 2972, subd. (c)), that is, whether he is disposed to commit a violent crime.[5] If the jury sees that the defendant is physically restrained, it may reasonably infer that the defendant is dangerous. Because the potential for this type of jury prejudice is the same whether a defendant is shackled in a criminal case or in a 1026.5 proceeding, we conclude once the defendant objected to the shackles, the People were required to establish manifest need for shackling on the record in accordance with *Duran*. (*Duran, supra,* 16 Cal.3d at pp. 291–292.) We also conclude the trial court was required to make its own independent determination of the need for physical restraints. (*Mar, supra,* 28 Cal.4th at p. 1218.)

Finally, the People argue that although the trial court erred in failing to exercise its discretion in ruling on defense counsel's request that defendant be unshackled, any error was harmless. We disagree with their assessment of prejudice given the circumstances of this case.

■ The California Supreme Court has not ruled which harmless error standard applies when a court abuses its discretion and permits a defendant to be shackled in violation of *Duran*. Thus far, the question appears to turn on whether the jury is aware of the physical restraints. "[W]hen a trial court abuses its discretion in shackling a defendant, evidence establishing that the jury saw the restraints means that the error rises to the level of constitutional error to be tested under the *Chapman* test.[6] Thus, while a brief glimpse of defendant in shackles would not constitute prejudicial error [citations], the use of physical restraints in the courtroom without a prior showing of the manifest need for such restraints violates *Duran*. [Citation.] When such restraints are visible to the jury for a substantial length of time without meeting the *Duran* requirements, this trial court error may deprive defendant of his due process right to a fair and impartial jury, and may affect the presumption of innocence. [Citation.] Accordingly, when such error occurs, it rises to the level of constitutional error." (*People v. Jackson* (1993) 14

---

[5] Section 1026.5, subdivision (b)(1) reads: "A person may be committed beyond the term prescribed by subdivision (a) only under the procedure set forth in this subdivision and only if the person has been committed under Section 1026 for a felony and by reason of a mental disease, defect, or disorder *represents a substantial danger of physical harm to others.*" (Italics added.)

Section 2972, subdivision (c) reads in part: "If the court or jury finds that the patient has a severe mental disorder, that the patient's severe mental disorder is not in remission or cannot be kept in remission without treatment, and that by reason of his or her severe mental disorder, the patient *represents a substantial danger of physical harm to others,* the court shall order the patient recommitted to the facility in which the patient was confined at the time the petition was filed, or recommitted to the outpatient program in which he or she was being treated at the time the petition was filed, or committed to the State Department of Mental Health if the person was in prison." (Italics added.)

[6] *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710–711, 87 S.Ct. 824].

Cal.App.4th 1818, 1830 [18 Cal.Rptr.2d 586], fn. omitted; see also *People v. Ceniceros* (1994) 26 Cal.App.4th 266, 278–279 [31 Cal.Rptr.2d 303].) In any event, the error in this case is prejudicial under either the *Chapman* or *Watson* standard.[7]

Here the record shows that the jury was aware defendant wore physical restraints. Indeed, a juror commented on defendant's shackles during voir dire. The question whether defendant "represented a substantial danger of physical harm to others" was before the jury as fact finders under section 1026.5 and the physical restraints spoke to that precise issue. Although the court admonished the jury not to take defendant's shackling "into account . . . as to whether or not he's a danger to others," the court did not provide the jury with a formal instruction on the issue.

The court not only refrained from exercising its discretion under *Duran*, but repeatedly told the jury, "It's not my decision." Instead, the court informed the jury that law enforcement decided defendant should appear in shackles. Thus, the very admonition the court asked the jury to follow may have created the impression that someone other than the court had determined defendant was too dangerous to be left unrestrained in the court room. In this context, it would be unrealistic and unfair to presume the jurors followed the court's admonition to disregard the shackles, as urged by the People.

In addition, the jury faced contradictory evidence on whether defendant represented a significant danger of physical harm to others at the time of trial. Dr. Rastegari testified that defendant had been verbally and physically aggressive between May 2004, when he returned to NSH, and February 2005, when he appeared at trial. In Rastegari's opinion, defendant remained a danger to others in the community. However, Rastegari also acknowledged that defendant had made some progress in the degree of assaultive and aggressive behavior he displayed since his return. Rastegari and defendant agreed that defendant had not injured anyone in the more than 20 years of hospitalization that followed defendant's attack on his mother. Defendant assured the court he would make sure to take his medications if released.

On this record, we cannot say the court's error in failing to exercise its discretion under *Duran* was harmless beyond a reasonable doubt. Defendant is entitled to a hearing wherein the shackling issue, if again presented, is appropriately considered and decided by the trial court.

---

[7] *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].

## DISPOSITION

The judgment is reversed.

Raye, Acting P. J., and Morrison, J., concurred.