Filed 6/27/24  P. v. Ayala CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062442 |
| v. | (Super. Ct. No. 22CF0883) |
| FRANCISCO JOSE AYALA, JR., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Michael J. Cassidy, Judge.  Affirmed in part and reversed in part.

Melanie L. Skehar, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette

C. Cavalier, Warren J. Williams, Kathryn Kirschbaum and Sahar Karimi, Deputy Attorneys General, for Plaintiff and Respondent.

\*      \*      \*

Defendant Francisco Jose Ayala, Jr., stands convicted of carjacking and receiving stolen property. He contends his trial attorney was ineffective for eliciting testimony that undermined his identification defense and for failing to object to one aspect of the prosecutor's closing argument. He also claims the trial court committed evidentiary and sentencing error, and he was improperly convicted of both taking and receiving the same vehicle. As respondent rightfully concedes, defendant's last claim has merit, and therefore we reverse his conviction for receiving stolen property. However, finding defendant's remaining arguments unavailing, we affirm the judgment in all other respects.

## FACTS

On the morning of April 8, 2022, R.M. was carjacked by two Hispanic men in the parking lot of a Home Depot in Santa Ana. R.M. did not see the men when he first parked his 2006 Ford Explorer at the store. But as he was about to exit the vehicle, a man in a white shirt opened his door and told him to step outside. R.M. restarted his vehicle, hoping he could drive away. But a second man, who was wearing a black shirt, put a bladed weapon against his ribs and told him he had three seconds to get out of the vehicle. R.M. complied, and after the men departed in his vehicle, he called 911.

R.M. told responding officers that the man in the white shirt was short and stocky, and the other man was taller and thinner with facial hair and a tattoo. He described the taller man's weapon as a knife-like object, roughly six to eight inches in length.

2

The following evening at 10:00 o'clock, Santa Ana Police Officer Travis Kennedy stopped a 2006 Ford Explorer near the intersection of Standard and Edinger for a traffic violation. When Kennedy approached the vehicle, he saw two Hispanic men inside; defendant, who was behind the wheel, and defendant's cousin, who was in the front passenger seat. Both of the men were wearing black gloves, even though it was a warm night, in the high 70's. Defendant had a mustache and a slight beard, as well as a tattoo near his right wrist. He was listed on his driver's license as being 5 feet, 11 inches tall.

During the stop, Kennedy searched the Explorer and found a dagger with a four-inch blade underneath the driver's seat. He also discovered the vehicle was wanted in connection with R.M.'s carjacking. At that point, the police brought R.M. to the scene for an infield showup. While defendant was handcuffed and standing between two police officers, R.M. identified him as the man in the black shirt who had carjacked him the previous day. He also identified the dagger Kennedy found as the weapon defendant had used during the heist. However, when asked if he could identify defendant's cousin, R.M. eliminated him as a suspect.

At trial, R.M. was unable to identify defendant in the courtroom. He said he was afraid to identify anyone because even though one of the suspects had been arrested, the other carjacker was still at large.

The defense theory was misidentification. In attempting to prove defendant was not involved in the carjacking, defense counsel presented an in-custody alibi witness who testified that he was smoking marijuana with defendant at defendant's house on the morning of the carjacking. In addition, a defense investigator testified that he showed R.M. an array of photos that included defendant's picture before trial, but R.M. was unable to identify

defendant as a suspect.  And lastly, the defense called an expert witness who testified about the various factors that impact the reliability of eyewitness identifications.

However, in the end, the jury convicted defendant as charged of carjacking and receiving stolen property, with an enhancement for personally using a deadly weapon during the carjacking.  In separate proceedings, defendant pleaded guilty to a drug charge and was found to be in violation of probation on four other cases.  The trial court sentenced him to five years in prison for his crimes.

## DISCUSSION

### I.

*Alleged Ineffective Assistance of Counsel for Eliciting Harmful Testimony*

Defendant faults his attorney for failing to recognize and take advantage of certain evidentiary deficiencies in the prosecution's case. According to defendant, his attorney not only failed to seize on those deficiencies, she elicited testimony that cured them and ended up employing a trial strategy that was constitutionally defective.  However, for the reasons explained below, we do not believe defense counsel represented defendant in a manner that violated his constitutional rights.

A.        *Applicable Law*

Criminal defendants have the right to effective assistance of counsel under both the state and federal Constitutions.  (*Strickland v. Washington* (1984) 466 U.S. 668; *In re Cordero* (1988) 46 Cal.3d 161, 180.)  In order to establish a violation of that right, the defendant must prove his attorney's performance fell below the standard expected of reasonably competent counsel, and there is a reasonable probability he would have obtained a more favorable result absent counsel's shortcomings.  (*People v.*

4

*Cunningham* (2001) 25 Cal.4th 926, 1003.)

That is a demanding standard. (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.) "To counteract the natural tendency to fault an unsuccessful defense, a court reviewing a claim of ineffective assistance must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' [Citation.]" (*Nix v. Whiteside* (1986) 475 U.S. 157, 165.) We will not "'second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' [citation]." (*People v. Weaver* (2001) 26 Cal.4th 876, 925–926.) Indeed, our high court has made it clear that such decisions are "virtually unchallengeable." (*Strickland v. Washington, supra,* 466 U.S. at p. 690.)

B.          *Factual and Procedural Background*

Defendant's ineffective assistance of counsel claim is premised on the assumption the prosecution failed to prove two essential points during its case-in-chief: 1) The vehicle that defendant was driving when Kennedy pulled him over was actually R.M.'s stolen vehicle; and 2) R.M. actually identified defendant during the infield showup procedure.

With respect to the first point, the prosecution established the vehicle taken from R.M. was a 2006 Ford Explorer, and defendant was driving a 2006 Ford Explorer when Kennedy pulled him over the follow day. However, the prosecution did not present any direct evidence that the vehicles were one in the same. It was not until defense counsel's cross-examination of Kennedy that this became clear.

While inquiring about the circumstances of the stop, defense counsel asked Kennedy if, after stopping defendant, he discovered his vehicle was wanted in connection with a carjacking investigation. After Kennedy

said yes, defense counsel then asked, "And that carjacking was from the day before, April 8th, at 9:00 a.m.?" Again, Kennedy answered in the affirmative.

As for the second evidentiary issue – R.M.'s identification of defendant – the prosecutor established through R.M. that when the police took him to the scene of defendant's traffic stop, they told him that just because a suspect was in custody, that did not mean he was guilty of any crime. They then showed him defendant and his cousin one at a time. R.M. was unable to identify defendant's cousin. However, he identified defendant as the man who was wearing the black shirt during the carjacking. When asked at trial why he identified defendant, R.M. said "his physical appearance was more or less like the person who stole my car."

During her cross-examination of Kennedy, defense counsel inquired more into the identification process. Kennedy testified the only person who was with R.M. when he identified defendant was "Officer Johnson."[1] Therefore, Kennedy did not have personal knowledge about what R.M. said during the identification process. Nevertheless, defense counsel asked Kennedy if he had any information as to how certain R.M. was when he identified defendant. Kennedy answered, "Officer Johnson related to me [R.M.] was absolutely certain that [defendant] was the guy who conducted the carjacking."

Following the prosecution's case-in-chief, defense counsel moved for an acquittal pursuant to Penal Code section 1118.1. Counsel argued there was insufficient evidence connecting defendant to the carjacking because R.M. was unable to identify defendant in court, and he testified he identified

---

[1] Officer Johnson did not testify at the trial, and his first name does not appear in the trial record.

6

defendant in the field merely because he "more or less" resembled one of the carjackers. Defense counsel acknowledged that she had elicited testimony from Kennedy that R.M. had expressed absolute certainty to Officer Johnson when identifying defendant in the field. However, because that testimony involved multiple layers of hearsay, and because Johnson was unavailable to testify at trial, defense counsel argued it was insufficient to prove defendant was involved in the carjacking.

In response, the prosecutor pointed out that not only was defendant identified by R.M. in the field, he also matched R.M.'s description of the black-shirted carjacker as being tall and thin with facial hair and a tattoo. In addition, R.M. identified the dagger found under defendant's car seat as the weapon that was used against him during the carjacking. Given all this evidence, as well as the fact that defendant and his cousin were wearing gloves when they were stopped, the trial court determined there was sufficient evidence to allow the issue of defendant's identification to go to the jury.

The court then discussed whether the vehicle defendant was driving when he was stopped was actually the vehicle that was taken from R.M. As to that issue, the court noted, "[R.M.] never said, 'Yeah, that was my car' that they stopped. Never got a license number. Never got anything to connect that car to anybody. [¶] All you have is [defendant] in the car with the dagger and an ID in the field. Nothing that ever identified the car as being [R.M.]'s car."

In response to these concerns, the prosecutor relied on testimony that defense counsel had elicited from Kennedy on cross-examination. Namely, Kennedy's testimony that the vehicle defendant was driving when he pulled him over was wanted in connection with R.M.'s carjacking. In light

7

of that testimony, and all of the other circumstantial evidence bearing on the issue, the trial court found there was sufficient evidence to allow the jury to find that defendant was driving R.M.'s vehicle when Kennedy pulled him over. Therefore, it denied defendant's motion for an acquittal. After that, the defense put on its three witnesses in an attempt to convince the jury that defendant was not involved in the carjacking. But, as it turned out, that defense ultimately proved unsuccessful.

C.        *Analysis*

Defendant does not fault his attorney for focusing on the issue of identification as a broad trial strategy. However, he contends it became clear following Kennedy's direct examination that there were holes in the prosecution's case-in-chief. Therefore, defense counsel should have refrained from asking Kennedy any questions on cross-examination and simply rested her case without calling any witnesses. That way, the prosecution would have been deprived of sufficient evidence to overcome the acquittal motion. And defense counsel could have focused on the lack of evidence to support the charges instead of trying to convince the jury that her witnesses were credible and persuasive.

"[I]t is a recognized defense strategy that in some cases it is best to stand on the evidence the prosecutor has presented and take the position that it doesn't amount to the crime charged." (*Jimenez v. Sisto* (N.D. Cal. 2009) 2009 U.S. Dist. LEXIS 126641, at *20.) However, that can be a risky strategy, and when used in a losing case, the defendant will often complain that a more vigorous defense was not employed. (See *United States v. Katz* (2d Cir. 1970) 425 F.2d 928, 930.) Thus, "the determination whether to put the prosecution to its proof is generally a tactical trial strategy which cannot form the basis for a claim of ineffective assistance. [Citations.]" (*Wajeel v.*

8

*Foulk* (C.D. Cal. 2015) 2015 U.S. Dist. LEXIS 95755, at *27.)

This rule is consistent with our experience that few cases are so cut and dried as to dictate a particular trial strategy for the defense. More often "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. [Citation.]" (*Strickland v. Washington, supra,* 466 U.S. at p. 689.) With that in mind, we find defense counsel's strategy in this case was not unreasonable; nor is it reasonably likely defendant would have fared better had his attorney handled his defense differently.

Several considerations drive us to this conclusion. First, even if defense counsel had not elicited any detrimental testimony from Kennedy on the issue of identification, that would not have prevented the prosecution from putting on additional evidence in response to defendant's motion for acquittal. Indeed, defendant admits the prosecution had evidence that the vehicle he was driving when he was pulled over by Kennedy belonged to R.M.[2] Thus, had defense counsel not elicited that evidence from Kennedy at trial, the prosecution could have asked the court to reopen its case to establish that fact. (*People v. Riley* (2010) 185 Cal.App.4th 754, 764-766.) There being no evidence of bad faith on the part of the prosecution, it is unlikely the trial court would have refused such a request. (*Ibid.*)

More fundamentally, defendant understates the nature and extent of the evidence the prosecution presented in its case-in-chief. Assuming defense counsel had not elicited any unfavorable testimony from Kennedy, and the prosecution was not permitted to reopen its case, the

---

[2] At the preliminary hearing, Kennedy testified that upon stopping defendant, he ran the license plate on his vehicle and determined it was wanted in connection with R.M.'s carjacking.

9

evidence implicating defendant in the carjacking was still substantial. Although R.M. did not identify defendant at trial, he said that was because only one of the two carjackers had been arrested. The implication was that R.M. feared reprisals from the second carjacker if he implicated defendant at trial.

That would explain why R.M. offered such a tepid response when asked why he identified defendant in the field. He told the jury it was because defendant "more or less" resembled the black-shirted carjacker. But during the actual identification process, R.M. made it clear he believed defendant was that suspect. While admitting the carjacking happened fast and made him nervous, R.M. unequivocally stated "that is him," meaning the black-shirted carjacker, when he saw defendant in the field. R.M. also identified the dagger that was found under defendant's seat after Kennedy pulled him over. Based on the size and color of the dagger, R.M. identified it as the weapon defendant had pressed against his ribs to gain his compliance during the carjacking.

The prosecution also established defendant matched the description R.M. gave the police of the black-shirted carjacker, in that he was tall and thin with facial hair and a tattoo. And, defendant and his cousin were wearing gloves when Kennedy stopped them, which was suspicious given how warm it was that evening.

Beyond implicating defendant in the carjacking, this evidence also proved the vehicle he was driving was R.M.'s. In fact, the evidence implicating defendant in the carjacking of R.M.'s 2006 Ford Explorer made it astronomically unlikely that he was driving a different vehicle of the exact same year, make and model some 36 hours after the carjacking took place. It stands to reason, as well, that the police would not have brought R.M. to the

10

scene in the first place if they did not have good reason to believe, through records or otherwise, that the vehicle was his.

Irrespective of any facts that were elicited by defense counsel, the totality of the prosecution's evidence was sufficient to defeat defendant's motion for acquittal, which merely required substantial evidence of the charged offenses. (See *People v. Maciel* (2013) 57 Cal.4th 482, 522 [noting the purpose of a Penal Code section 1118.1 motion is simply to weed out those few instances in which prima facie proof of the charged crimes is lacking].)

The substantial nature of the evidence also leaves little doubt that defense counsel's decision to put on an affirmative defense, rather than simply to rely on the perceived weaknesses in the prosecution's case, was a reasonable trial tactic. (*Kokinda v. Coleman* (E.D. Pa. 2017) 2017 U.S. Dist. LEXIS 64895.) Although her trial strategy ultimately proved unsuccessful, that does not mean she was derelict for failing to adopt the strategy that defendant offers with the advantage of 20-20 hindsight. (*Ward v. Hall* (11th Cir. 2010) 592 F.3d 1144, 1164 ["the fact that a particular defense was unsuccessful does not prove ineffective assistance of counsel"].) Perceiving neither deficient performance nor resulting prejudice from defense counsel's chosen strategy, we reject defendant's claim that his attorney was constitutionally ineffective.

II.

*Failing to Object to the Prosecutor's Closing Argument*

Defendant claims his attorney was also ineffective for not objecting to a comment the prosecutor made about his expert witness in closing argument. We disagree.

11

A.          *Factual and Procedural Background*

At trial, the defense called psychologist Steven Frenda as an expert witness on eyewitness identification. At a pretrial hearing on the scope of Frenda's testimony, defense counsel said she intended to ask him about "human memory, proper ways and improper ways to conduct a photo lineup, and the pitfalls of a showup identification." The trial judge told defense counsel that would be fine, so long as she did not ask Frenda about any of the specific facts in the case.

During her questioning of Frenda, defense counsel adhered to that limitation. She asked Frenda about the current research in the area of memory and eyewitness identification, and he said there have been studies showing that infield showups can be unduly suggestive, especially when the suspect is being held by the police in handcuffs. Even though that is exactly how defendant was being detained when R.M. identified him, defense counsel did not ask Frenda about the reliability of R.M.'s identification.

However, even if she had questioned Frenda on that topic, it would not have been a fruitful exercise. That is because Frenda made it clear in his testimony that psychologists like himself can only explain the science of human memory and the factors that bear on the reliability of eyewitness identifications; they cannot determine whether a particular identification is reliable.

In his closing argument, the prosecutor acknowledged Frenda's testimony about the suggestibility of infield showups. However, he also noted that Frenda "wasn't asked to give an opinion about the specific facts of this case." The prosecutor then pointed out that although R.M. had identified defendant while he was handcuffed and surrounded by police officers, R.M. also eliminated defendant's cousin as a suspect under the exact same

12

circumstances. The prosecutor argued this proved the showup procedure used in this case was not unduly suggestive, and R.M.'s identification of defendant was reliable.

B.          *Analysis*

Defense counsel did not object to this argument. However, defendant contends she should have because the prosecutor improperly implied the defense was trying to "hide the ball" by not asking Frenda to give an opinion regarding the specific facts of this case. However, as explained above, Frenda himself testified he was not in a position to offer an opinion about whether R.M.'s identification of defendant was reliable. Therefore, it is unlikely the jury interpreted the prosecutor's brief remark as a jab against defense counsel, as opposed to a legitimate observation about the inherent limitations of her case.

Moreover, the context of the remark shows it was aimed at a broader point unrelated to anything Frenda said or did not say during his testimony. The prosecutor was simply trying to make the case that, despite the inherent problems associated with infield showups, the circumstances surrounding R.M.'s identification of defendant were such as to render the identification reliable. Of course, as was her right, defense argued just the opposite in her closing argument, so the jury got to hear both sides of the issue. Given all of these circumstances, the prosecutor's challenged remark was relatively unimportant. Therefore, defense counsel was not derelict for failing to object to it. (Compare *People v. Ledesma* (1987) 43 Cal.3d 171, 224 [defense counsel deemed ineffective for not objecting to critical identification evidence that the prosecutor had promised not to present at trial].)

## III.

### *The Trial Court's Handling of Defense Counsel's Alibi Witness*

Defendant contends the trial court erred in refusing to allow his alibi witness Joshua Baron to testify in civilian clothing. However, any such error was harmless under the circumstances presented.

A.          *Factual and Procedural Background*

Baron was in custody at the time of defendant's trial. On the morning he was scheduled to testify, defense counsel told the judge she had been trying for weeks to arrange for him to appear at trial in civilian clothing. However, due to no fault of her own, there had been a mix-up at the jail, and her clothing exchange order never got processed. Consequently, Baron was brought into court wearing orange inmate pants and a green shirt that had "OC Jail" printed on it. Defense counsel told the judge she could obtain civilian clothing for Baron in five minutes, but because the judge was already ten minutes late in commencing trial that morning, he refused counsel's request for a continuance. Defense counsel then asked if Baron could at least turn his shirt inside out, so the jury would not see the OC Jail logo on it while he was testifying. However, the judge determined that was unnecessary because it would still be obvious to the jury that Baron was in custody.

In fact, during his testimony, Baron readily admitted he was currently serving time in jail, having suffered felony convictions for second degree burglary, receiving stolen property, and unlawful vehicle taking. Baron also admitted that he and defendant were such good friends that he considered defendant to be "like a brother" to him. Regarding the day in question, Baron told the jury he arrived at defendant's house at 10:00 a.m., which was an hour after R.M. was carjacked. Per their usual routine, he and

14

defendant smoked marijuana together for a while, before Baron had to catch the bus for work. During that time, Baron did not notice any Ford Explorers on the street in front of defendant's house.

B.         *Analysis*

In the interest of fairness, it is generally preferrable to have a defendant's in-custody witnesses testify in civilian clothing, as opposed to jail garb. (See *People v. Froehlig* (1991) 1 Cal.App.4th 260, 264.) That's because, as defendant notes, optics can be very important to the jury. However, "[t]he appearance of a defense witness attired in prison clothes does not . . . adversely affect the presumption of innocence or carry with it the inference that the defendant is a person disposed to commit crimes. [Citations.]" (*Ibid.*, italics omitted.) Therefore, its impact on the defense is less consequential than if the defendant himself is made to testify in prison clothing. (*Ibid.*)

The possibility of prejudice is also diminished when, as here, the jury is instructed, "The fact that a witness is in custody does not by itself make a witness more or less believable." There being nothing in the record to suggest otherwise, we presume the jury followed this instruction. (*People v. Yeoman* (2003) 31 Cal.4th 93, 138-139.)

Even if it did not, Baron had an independent credibility problem stemming from his prior felony convictions. (See *People v. Hinton* (2006) 37 Cal.4th 839, 888 [the law plainly permits a witness to be impeached with evidence that he or she has been convicted of a felony].) Because Baron's testimony was susceptible of impeachment by virtue of his criminal history, his prison clothing was essentially superfluous to his credibility. (See *People v. Valenzuela* (1984) 151 Cal.App.3d 180, 194.)

15

Irrespective of Baron's credibility problems, the substance of his testimony was not very helpful to the defense. While he claimed he was smoking marijuana with defendant at 10:00 a.m. on the morning of the carjacking, he admitted he had no idea where defendant was or what defendant was doing an hour earlier, when R.M.'s vehicle was taken.

The court's refusal to accommodate the request for an incarcerated witness to change from prison to civilian clothing, even when facing an additional 5-minute delay, is concerning, as is refusing a simple, alternative request to turn a shirt inside out in an attempt to mask prison garb. Trial courts must remain vigilant in their efficient use of time, particularly when it comes to juries, but never at the expense of creating greater potential for unfair prejudice to the accused. Still, the circumstances present here demonstrate that any error in having Baron testify in jail clothing was patently harmless. Reversal is not required under any standard of care.

## IV.

### *Cumulative Error*

Defendant contends that even if the alleged errors discussed above do not individually warrant reversal, their combined effect violated his right to a fair trial. However, defendant's attorney put on a robust defense, and the lone alleged trial court error was de minimis under the circumstances presented. There is no reasonable basis to conclude that defendant would have obtained a more favorable verdict had the alleged errors never occurred.

V.

*Improper Dual Convictions*

Nonetheless, it is well established that a defendant cannot be convicted of both stealing and receiving the same property. (*People v. Garza* (2005) 35 Cal.4th 866, 874-875; *People v. Allen* (1999) 21 Cal.4th 846, 852; *People v. Jaramillo* (1976) 16 Cal.3d 752, 757.) The parties agree, and so do we, that rule applies here to preclude defendant's conviction for receiving stolen property. (*People v. Magallanes* (2009) 173 Cal.App.4th 529.) Therefore, we will reverse defendant's conviction for that offense. (*Id*. at p. 536.)

VI.

*Sentencing*

Lastly, defendant argues the trial judge erred in sentencing him to the middle term of five years for his carjacking offense, as opposed to the lower term of three years. Defendant asserts imposition of the middle terms constituted an abuse of discretion because the judge failed to consider the trauma he endured as a child. However, the record shows the judge properly considered that factor in formulating his sentencing decision. As such, there is no reason to disturb defendant's sentence.

A.        *Factual and Procedural Background*

As reflected in the presentence probation report, defendant was only 23 years old when he carjacked R.M.'s vehicle. However, prior to that time, he had already suffered four felony convictions and a dozen misdemeanor convictions for such crimes as possessing stolen property, vehicle theft, resisting arrest, and hit and run. Defendant's extensive prior record was one of six aggravating factors cited in the probation report,

17

against only one mitigating factor, that being his status as a youthful offender.

When interviewed by probation, defendant said he had a happy childhood and a loving and supportive family.  But, as part of her sentencing brief, defense counsel included investigative reports indicating otherwise.  The reports revealed that defendant had witnessed considerable physical abuse between his parents while growing up.  He was also forced to sell candy on the streets to support his father's drug habit.  And, in his early teens, after his parents got divorced, defendant started using drugs himself, while he was living in a van with his father.  Things improved for defendant as a young adult after he got sober, moved into a place with his girlfriend, and they had a child together.  However, defendant's father broke into their residence and continued to cause problems, which resulted in defendant relapsing and the departure of his girlfriend.

In light of these circumstances, defense counsel contended in her sentencing brief that if defendant was not suitable for probation, he should receive the lower term of three years on the carjacking count, pursuant to Penal Code section 1170, subdivision (b)(6) (section 1170(b)(6)).  Defense counsel echoed that argument at the sentencing hearing, again citing defendant's childhood trauma as a justification for the lower term.  For its part, the prosecution urged the court to impose the upper term of nine years for the carjacking offense.

At the sentencing hearing, the trial judge said he had read and considered the probation report and the parties' sentencing materials.  He also acknowledged defendant's youth and the circumstances cited in defense counsel's sentencing brief, which was an obvious nod to defendant's childhood trauma.  However, after denying probation, the judge decided the overall

18

circumstances warranted the middle term of five years on the carjacking count, not the lower term defense counsel had requested.  The judge stayed sentence on the remaining counts and struck the weapon enhancement for purposes of sentence.  He also revoked and terminated probation on defendant's other cases.

B.        *Analysis*

Section 1170(b)(6) provides, "[U]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense:  [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence."

Defendant argues the trial judge did not affirmatively comply with this statute because, in choosing the middle term on the carjacking count, he did not expressly balance the aggravating circumstances against the mitigating circumstance of defendant's childhood trauma, nor did he make an express finding that imposition of the lower term would contravene the interests of justice.  However, "[a]bsent evidence to the contrary, we presume that the trial court knew the law and followed it." (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042.)  It is defendant's duty to prove the trial court misunderstood the scope of its discretion or acted in an irrational or arbitrary fashion in arriving at its sentencing decision.  (*People v. Fredrickson* (2023) 90 Cal.App.5th 984, 988.)

Here, there is nothing to suggest the trial judge was unaware of section 1170(b)(6) or failed to follow it in imposing defendant's sentence.  In fact, it was readily apparent from defense counsel's sentencing brief and

19

hearing arguments that she was relying on that statute in advocating for imposition of the lower term. Moreover, in sentencing defendant on the carjacking count, the judge made it clear he was taking into account the circumstances outlined in the brief, which focused extensively on defendant's childhood trauma. The judge also referenced those circumstances in striking the weapon enhancement.

However, in arriving at defendant's sentence, the judge also considered the probation report, which shows that defendant has an extensive criminal record and that the seriousness of his crimes has increased over time. (Cal. Rules of Court, rule 4.421(b)(2).) And, the judge expressly found that three additional aggravating circumstances were applicable in this case: 1) the carjacking involved the threat of great bodily harm; 2) defendant engaged in conduct that indicates a serious danger to society; and 3) defendant was on probation when he carried out his crimes. (Cal. Rules of Court, rule 4.421(a)(1), (b)(1) & (b)(4).)

On this record, it is reasonable to conclude the trial judge was fully aware of the presumption for the lower term under section 1170(b)(6) but that he determined the numerous aggravating circumstances outweighed the mitigating ones – including defendant's childhood trauma – such that imposition of the lower term on the carjacking count would defeat the ends of justice. Therefore, there is no reason to disturb defendant's sentence.

## DISPOSITION

Defendant's conviction for receiving stolen property is reversed. In all other respects, the judgment is affirmed.



DELANEY, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.